**STATE of Utah, Plaintiff and Respondent,**

v.

**Lloyd MILLER, Defendants and Appellants.**

**No. 17914.**

Supreme Court of Utah.

Feb. 16, 1984.

Frances M. Palacios, David C. Biggs, Salt Lake Legal Defenders Assoc., Salt Lake City, for defendants and appellants.

David L. Wilkinson, Atty. Gen., Dave Thompson, Salt Lake City, for plaintiff and respondent.

DURHAM, Justice.

Lloyd Miller was convicted of conspiracy to commit aggravated arson and conspiracy to commit insurance fraud by a jury in the Third Judicial District of Salt Lake County. The appellant claims that the evidence was insufficient to sustain his conviction and that the trial court committed prejudicial error in refusing to admit certain expert testimony. We reverse.

Appellant Miller demonstrated a somewhat flamboyant and exotic background at trial. He has been interested in the Middle East for most of his life, and he lived in Tehran for a total of about seven years. He speaks fluent Persian and some Arabic and Iraqi. Miller holds bachelors and masters degrees in Eastern studies and was working on a doctorate degree in Middle East studies at the time of this prosecution. His wife, who was a co-defendant at trial, is a native of Kabul.

Miller and his wife owned and operated two adjoining businesses, the Khyber Kitchen restaurant and the New Eastern Third World Gifts shop. The restaurant was financially unsuccessful, and Miller was also having problems with the gift shop. His practice of calling customers into his shop from the street, as Miller claimed was the usual practice in the Middle East, and his playing of loud Middle Eastern music on speakers mounted on the

outside of his store had alienated a neighbor merchant who dealt in similar merchandise. Miller also felt insulted when his landlord raised the rent and notified him that he would have to leave the building at the end of the year.

In early August 1980, Miller met Don Stewart, a frequent police informer and weapons expert, at a gun show in Salt Lake City. Stewart there purchased a firearm from Miller; thereafter on several occasions the two met at Miller's business to converse generally and to discuss further weapons deals. During one of these conversations, in early October, a bizarre scheme was discussed to steal red-eye missiles from a military base and fly them in a World War II bomber to fighters resisting the Russians in Afghanistan. The testimony is contradictory as to whether Miller or Stewart first raised this idea. Miller claims that Stewart devised the scheme and that all of their discussions were on a purely fantasy level. Stewart went to the Federal Bureau of Investigation with information about their conversations. He continued to visit Miller, now with the additional purpose of getting more information about the missile scheme.

In late October, during one of these visits, the idea of burning Miller's business premises to collect on insurance came up. Again, the testimony is contradictory as to who proposed the plan, with Miller claiming that the idea was Stewart's and that he entered into the discussion to humor him and for the "fantasy effect." When Stewart returned to the FBI with this information, he was told to contact the Salt Lake County Arson Strike Force about the proposed arson. He did so in late November. Stewart was supplied with a hidden recording device, Miller's business was put under surveillance by the strike force, and one evening in late November several incriminating statements about the planned arson were elicited from Miller by Stewart.

At trial, Miller's defense attorney offered the testimony of Dr. Madsen, a psychiatrist qualified as an expert witness. Dr. Madsen had examined Miller nine times in the course of counseling and psychotherapy af-

ter the incidents surrounding the charged conspiracy. Dr. Madsen's testimony was described by proffer. He would have testified that Miller had a history of psychiatric care since childhood and that, although Miller was aware of the nature and consequences of his actions, he was a "Walter Mitty" type, possessed of a vivid imagination and often reckless in his talk without having any intention of carrying out his schemes. Dr. Madsen would also have testified that in his opinion the incident for which Miller was on trial had "the same quality and character" as other harmless incidents in Miller's past, and it demonstrated the workings of an active imagination rather than the intent to carry out an act.

The record is somewhat confusing as to the particular grounds under which Dr. Madsen's testimony was offered. During the original discussion surrounding the prosecution's motion in limine to exclude Dr. Madsen's testimony, defense counsel offered Dr. Madsen as a character witness, but also proffered that the doctor's testimony would refute the intent element of the conspiracy charge. At this point the trial judge took the matter under advisement. The next day defense counsel proffered that Dr. Madsen would "testify that Mr. Miller did not intend to commit the arson," which was a clear indication that the expert testimony was offered to rebut the existence of an essential element of the crime charged. The trial judge nevertheless granted the prosecution's motion in limine and prohibited Dr. Madsen from testifying.

When a specific intent or purpose is an element of the crime charged, "basic rules of evidence pertaining to materiality and relevance require that a defendant have the right to adduce evidence which would tend to disprove the existence of a specific intent." *State v. Sessions*, Utah, 645 P.2d 643, 645 (1982) (dictum). In a conspiracy prosecution, the State must prove that the conspirator specifically intended to commit conduct constituting a crime. U.C.A., 1953, § 76-4-201. Dr. Madsen should have been allowed to testify

that Miller suffered from a mental condition that resulted in manifestations of a vivid and overactive imagination. *See Sessions, supra* n. 3, and accompanying text. Such testimony would have allowed the jury to better consider whether Miller possessed the specific intent necessary to conspire to burn his store and could reasonably have resulted in a different verdict. The expert testimony would also have been strongly corroborative of Miller's claims that he was only fantasizing in his discussions with Stewart and that he never had any intention of acting on any of their ideas or conversations.

Miller also contends that the information charging him with conspiracy to commit insurance fraud failed to allege any overt acts in furtherance of this conspiracy and that, therefore, his conviction for this conspiracy should be reversed and the charge dismissed. U.C.A., 1953, § 76–4–201 requires that for the crime of criminal conspiracy to exist at least one conspirator must "commit ... an overt act in pursuance of the conspiracy, except where the offense is a capital offense, a felony against the person, arson, burglary, or robbery, the overt act is not required for the commission of the conspiracy." An overt act is clearly necessary for an agreement to commit insurance fraud to constitute a criminal conspiracy. U.C.A., 1953, § 77–17–4 states:

> [O]n trial for conspiracy in a case where an overt act is necessary to constitute the offense, the defendant shall not be convicted unless one or more overt acts are expressly alleged in the information or indictment, and unless one of the acts alleged has been proved.

The overt acts alleged in the information charging Miller with conspiracy to commit insurance fraud are that Miller and his wife paid Stewart $50 and a soda dispenser to burn the restaurant and the shop, that they moved the bulk of the merchandise from the restaurant and store, and that Miller left town to establish an alibi. The appellant contends that conspiracy to commit insurance fraud requires an overt act with respect to the fraud against an insurance company, and the actions listed in the information could only be overt acts in furtherance of a conspiracy to commit arson. With this contention we disagree.

> [T]he overt act might, but need not necessarily be the very crime that is the object of the conspiracy.
>
> . . . .
>
> [I]f [the conspirators enter] into [an] agreement then the crime of conspiracy [is] complete when, in addition thereto, they, or either of them, [do] any act "to effect the object" of the agreement, even though that act did not itself effect the object of the agreement.

*State v. Erwin*, 101 Utah 365, 383, 120 P.2d 285, 295 (1941). If the overt act is done to effect the object of the conspiracy, it does not matter how remote the act may be from accomplishing its object. "The function of the overt act in a conspiracy prosecution is simply to manifest 'that the conspiracy is at work,' and is neither a project still resting solely in the minds of the conspirators nor a fully completed operation no longer in existence." *Yates v. United States*, 354 U.S. 298, 334, 77 S.Ct. 1064, 1084, 1 L.Ed.2d 1356 (1957) (citation omitted). It is absurd to suggest that an overt act in furtherance of a conspiracy to commit insurance fraud must entail some act in relation to an insurance company, such as a filing of a claim of loss or the request for claim forms. If such were the law, there would rarely, if ever, be a conviction for conspiracy to commit insurance fraud unless an antecedent crime, such as the arson in this case, had already been accomplished. This is not the function of the overt act required. If two people agree to both wrongfully burn a building and fraudulently collect insurance proceeds for the building loss, they have engaged in conspiracy as soon as they demonstrate, by some overt act, that their plan does not rest solely in their minds. Thus we reject appellant's contention on this point.

Based on our holding above regarding the expert testimony tending to show no intent, however, we reverse the appellant's conviction. In view of the fact that his

primary theory of defense (that he was merely enjoying "high adventure," not planning to commit a crime) was plausible in the context of the other evidence [1] if the jury believed it, we cannot say that the failure to permit corroborative evidence from a medical expert was not prejudicial. The psychiatrist's testimony regarding Mr. Miller's unusual personality might well have convinced the jury that he never formed the criminal intent requisite for conviction. Therefore, we reverse the conviction and remand this case for a new trial.

HALL, C.J., and OAKS and HOWE, JJ., concur.

STEWART, J., does not participate herein.

1. In addition to the facts summarized at the outset of this opinion, the evidence also showed that neither of the Millers was a beneficiary on the insurance on one of the businesses, and Miller offered alternative explanations of otherwise damaging circumstantial evidence: *e.g.,* that he gave Stewart the $50 to repair a van, that the merchandise and fixtures were moved to a new location which had been previously leased pursuant to a plan to change locations, and that his out-of-town visit on the weekend of the alleged plan to burn was one of his usual visits to his family home in Idaho.