STATE of Utah, Plaintiff and Appellee,

v.

Fred W. STANDIFORD, Defendant and Appellant.

No. 20345.

Supreme Court of Utah.

Dec. 30, 1988.

David L. Wilkinson, Sandra L. Sjogren, Salt Lake City, for plaintiff and appellee.

David A. Hansen, Phil L. Hansen, Steven L. Hansen, Salt Lake City, for defendant and appellant.

STEWART, Justice:

Defendant Fred W. Standiford was convicted of second degree murder for the fatal stabbing of Hisae Wood. He appeals the conviction on a variety of grounds. We affirm.

## I. THE FACTS

Sometime between 3:00 a.m. and 4:00 a.m. on April 27, 1984, Hisae Wood was

stabbed to death in an assault during which 107 stab wounds were inflicted on her body. Earlier that night, Standiford had been in his garage with his friend, Joey Granato, painting Granato's Jeep. Twice during the evening, Standiford and Granato went to Wood's residence to purchase cocaine. After each trip, Standiford and Granato freebased the cocaine and then resumed painting the Jeep. Around 4:00 a.m., Standiford told Granato that he was going to a convenience store to buy cigarettes. Although he was gone longer than necessary for that errand, his behavior was not unusual when he returned. When Standiford revealed that he had more cocaine, Granato asked if Standiford had returned to the Woods' residence. Standiford replied that he had not and indicated that he had merely saved the cocaine from one of their earlier purchases.

The next day, Standiford contacted Granato and asked if he had heard that Mrs. Wood had been murdered. Later that day, Standiford was questioned by the police. Afterwards, he told Granato that they were both in trouble and that if the police asked, Granato should tell the police that he and Standiford had not left the garage all night. Granato became concerned, contacted the police, and volunteered a statement about his and Standiford's whereabouts and their cocaine purchases. Based on Granato's statement, the police searched Standiford's house and garage and found incriminating evidence.

When confronted with Granato's statement, Standiford confessed to killing Mrs. Wood but claimed that he had acted in self-defense. He asserted that Mrs. Wood came after him with a gun, screaming in Japanese, and grabbed him. He seized the closest weapon, a kitchen knife, intending only to scare her, and since the threat of the knife did not stop her, he just started swinging the knife. After he realized that Mrs. Wood was dead, Standiford went into the kitchen and washed his hands and the knife, wiped off his fingerprints with a kitchen towel, and turned off the lights in the house. He then took a bag of cocaine, the knife, and the gun allegedly brandished by Mrs. Wood and left. After disposing of the knife, he stopped at a convenience store and then returned home, where he changed his clothes and hid the evidence. The gun he said he took was not found.

Another of Standiford's friends, Don Bendixen, testified that several days prior to the incident, Standiford had mentioned to him that Mrs. Wood's husband was going to be out of town and that it would be easy to "knock her out and possibly kill her and take everything she has." When Bendixen commented that that was "crazy thinking," Standiford replied that he was only joking.

After Standiford was charged, defense counsel contacted Dr. Lincoln Clark, a psychiatrist, and asked him to evaluate Standiford's case to determine whether he could assist the defense. Counsel gave Dr. Clark defendant's file, which consisted of police reports and a transcript of Standiford's taped confession. Defendant asserts that it may have also contained a handwritten statement of facts prepared by Standiford for his attorney, although Dr. Clark testified that he did not remember reviewing any handwritten statement. The next day, Dr. Clark informed counsel that his opinion would not help the defense and that the file could be picked up. At trial, Dr. Clark testified on behalf of the prosecution and in rebuttal to defendant's expert that Standiford's drug abuse was not a significant factor in committing the homicide.

## II. JURY UNANIMITY ON TYPE OF SECOND DEGREE MURDER

Defendant argues that the jury instructions on second degree murder violated his right to a unanimous jury verdict under article I, section 10 of the Utah Constitution because they did not specifically require jury unanimity as to whether the mens rea found by the jury was intent to kill, intent to cause grievous bodily harm, or knowing conduct that created a grave risk of death with depraved indifference to human life. *State v. Russell*, 733 P.2d 162 (Utah 1987), held that a jury does not have to be unanimous in deciding which of the three culpable mental states it finds in con-

victing of second degree murder, as long as the jurors are unanimous that one or another form of second degree murder was committed. That holding was based on the historical development of the crime of murder with malice aforethought[1] and on the similarity of the culpability required by the three alternatives. Compare *State v. Tillman*, 750 P.2d 546, 577–80, 585–88 (Utah 1988) (Stewart, J., concurring and concurring in the result and Durham, J., concurring and dissenting), where a majority of the Court held that jury unanimity is necessary as to all other elements in criminal cases. *See also State v. Rasmussen*, 92 Utah 357, 68 P.2d 176 (1937).

## III. JURY INSTRUCTIONS

### A. *Malice Aforethought: Second Degree Murder*

Standiford asserts that the trial court erred in failing to instruct the jury that second degree murder required proof of "malice aforethought." Prior to the adoption of Utah's current criminal code in 1973, murder was defined as "the unlawful killing of a human being with malice aforethought." Utah Code Ann. § 76–30–1 (1953) (repealed 1973). Defendant relies on *Farrow v. Smith*, 541 P.2d 1107, 1109 (Utah 1975), for the proposition that the trial court should have instructed on malice aforethought. In *Farrow*, the Court stated in dictum:

> For many years the definition of second degree murder has been the unlawful killing of a human being with malice aforethought, and ... manslaughter was the unlawful killing of a human being without malice. In our opinion the new criminal code has not changed those definitions.

In at least one other case, this Court has also referred to "malice aforethought." *State v. Norman*, 580 P.2d 237, 240 (Utah 1978).

The present criminal code abandoned the common law terminology of malice aforethought and adopted more descriptive and precise language describing the requisite culpable mental states in defining the various crimes. Since the term "malice afore-

---

1. The commentary to the Model Penal Code summarizes the common law concept of malice aforethought:

 > At common law, murder was defined as the unlawful killing of another human being with "malice aforethought." Whatever the original meaning of that phrase, it became over time an "arbitrary symbol" used by judges to signify any of a number of mental states deemed sufficient to support liability for murder. Successive generations added new content to "malice aforethought" until it encompassed a variety of mental attitudes bearing no predictable relation to the ordinary sense of the two words....
 >
 > Various authorities have given different summaries of the several meanings of "malice aforethought." Generally, these definitions converge on four constituent states of mind. First and foremost, there was intent to kill. Common-law authorities included in the notion of intent to kill awareness that the death of another would result from one's actions, even if the actor had no particular desire to achieve such a consequence. Thus, intentional or knowing homicide was murder unless the actor killed in the heat of passion engendered by adequate provocation, in which case the crime was manslaughter. A second species of murder involved intent to cause grievous bodily harm. Again, knowledge that conduct would cause serious bodily injury was

 generally assimilated to intent and was deemed sufficient for murder if death of another actually resulted. A third category of murder was sometimes called depraved-heart murder. This label derived from decisions and statutes condemning as murder unintentional homicide under circumstances evincing a "depraved mind" or an "abandoned and malignant heart." Older authorities may have described such circumstances as giving rise to an "implied" or "presumed" intent to kill or injure, but the essential concept was one of extreme recklessness regarding homicidal risk. Thus, a person might be liable for murder absent any actual intent to kill or injure if he caused the death of another in a manner exhibiting a "wanton and willful disregard of an unreasonable human risk" or, in confusing elaboration, a "wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty." The fourth kind of murder was based on intent to commit a felony. This is the origin of the felony-murder rule, which assigns strict liability for homicide committed during the commission of a felony. These four states of mind exhausted the meaning of "malice aforethought"; the phrase had no residual content.

 Model Penal Code, § 210.2 comment 1 at 13–15 (Official Draft and Revised Comments 1980) (footnotes omitted; citations omitted).

thought" is a confusing carry-over from prior law and can lead to confusion, if not error, it should no longer be used. The present second degree murder statute sets forth the necessary mental states required for each type of second degree murder, except as modified by case law. *See State v. Bolsinger,* 699 P.2d 1214 (Utah 1985); *State v. Fontana,* 680 P.2d 1042 (Utah 1984). The statute provides:

> **Murder in the second degree**—(1) Criminal homicide constitutes murder in the second degree if the actor:
> (a) intentionally or knowingly causes the death of another;
> (b) intending to cause serious bodily injury to another, he commits an act clearly dangerous to human life that causes the death of another;
> (c) acting under circumstances evidencing a depraved indifference to human life, he engages in conduct which creates a grave risk of death to another and thereby causes the death of another; or
> (d) while in the commission, attempted commission, or immediate flight from the commission or attempted commission of [certain enumerated felonies], [the actor] causes the death of another person other than a party....

Utah Code Ann. § 76–5–203 (Supp.1988).

Thus, the culpable mental states included in the second degree murder statute are (1) an intent to kill, (2) an intent to inflict serious bodily harm, (3) conduct knowingly engaged in and evidencing a depraved indifference to human life, and (4) intent to commit a felony other than murder.

These terms are comparable to the old malice aforethought, but are much more precise and less confusing. The statute treats these forms of homicide as having similar culpability. Second degree murder is based on a very high degree of moral culpability. That culpability arises either from an actual intent to kill or from a mental state that is essentially equivalent thereto—such as intending grievous bodily injury and knowingly creating a very high

risk of death. The risk of death in the latter two instances must be so great as to evidence such an indifference to life as to be tantamount to that evidenced by an intent to kill. In contrast, the felony-murder provision of the second degree murder statute is something of an exception to the above principle, as it does not require an intent to kill or any similar mental state.

The trial court framed its second degree murder and manslaughter instructions .in the statutory language and correctly refused to give defendant's requested malice aforethought and absence of malice instructions. *See Bolsinger,* 699 P.2d 1214; *Fontana,* 680 P.2d 1042. To the extent that *Farrow v. Smith, State v. Norman,* and any other cases have perpetuated the use of malice aforethought with respect to second degree murder, they are disapproved.

### B. Manslaughter

◼ Defendant also challenges the trial court's refusal to give his requested heat-of-passion manslaughter instruction. The common law, and our previous law, defined manslaughter, *inter alia,* as a killing committed without malice, and the term "without malice" meant a homicide committed either (1) in the "heat of passion" for which there was an adequate provocation, or (2) by an unduly dangerous or.otherwise unlawful act. Instead of incorporating the "heat of passion" standard, the current criminal code redefined that type of manslaughter to describe the conduct of one who

> causes the death of another under the influence of extreme emotional disturbance for which there is a reasonable explanation or excuse....

Utah Code Ann. § 76–5–205(1)(b) (Supp. 1988).[2] This definition reformulates and enlarges the heat-of-passion standard to include any extreme emotional disturbance based on a reasonable excuse or explanation that mitigates the blameworthiness of the homicide. *See State v. Bishop,* 753

---

**2.** This section was largely based on the Model Penal Code, but it has been amended in several respects. *See State v. Bishop,* 753 P.2d 439, 489, 491, 493 (Utah 1988) (separate opinions of Stewart, J., Durham, J., and Zimmerman, J.).

P.2d 439, 489–90, 491–92 (Utah 1988) (separate opinions of Stewart, J., and Durham, J.); Model Penal Code § 210.3 comment 5(b) at 72 (Official Draft and Revised Comments 1980). The manslaughter instruction the trial court gave was based on § 76–5–205, and it was correct. *See Bishop*, 753 P.2d at 489–90; *State v. Watts*, 675 P.2d 566, 568 (Utah 1983).

Defendant also challenges a number of other instructions, contending that they were misleading or inconsistent.

## C. Specific Intent

First, defendant argues that instruction No. 21, which defined second degree murder, was an erroneous statement of the law and was inconsistent with instruction No. 20, a general instruction requiring that a specific intent must be proved beyond a reasonable doubt. We disagree.

Instruction No. 21 stated:

Criminal homicide constitutes murder in the second degree if the actor: (a) intentionally or knowingly causes the death of another; or (b) intending to cause serious bodily injury to another, he commits an act clearly dangerous to human life that causes the death of another; or (c) acting under circumstances evidencing a depraved indifference to human life, he knowingly engaged in conduct which creates a grave risk of death to another and thereby causes the death of another.

Instruction No. 21 was taken verbatim from the statutory definition of second degree homicide in the criminal code, except for subparagraph (c) above, which was modified to conform to our opinion in *Fontana*, 680 P.2d at 1046–47, by adding the term "knowingly." Instruction No. 21 was not erroneous as far as it went but, for reasons explained below, should have been amplified with respect to the magnitude of the risk of death required in depraved indifference murder.

 In any event, instruction No. 21 was not inconsistent with instruction No. 20, which stated: "[W]ith respect to an offense such as charged in this case, specific intent must be proved beyond a reasonable doubt before there can be a conviction." Instruction No. 21 did not use the term "specific intent"; nor did it have to.[3] Rather, it specifically incorporated the culpable mental state requirements set out in the statute. Although the jury may have had some doubt about the meaning of the term "specific intent," it was unambiguously instructed on the mental states it had to find to convict, and it was adequately instructed elsewhere on the necessity of proof beyond a reasonable doubt as to all elements.

In the future, trial courts should define the term "specific intent" for the jury, if that term is used; and if it is, it should be

**3.** We are aware that the Model Penal Code has abandoned use of the terms "specific intent" and "general intent." *See* Model Penal Code § 2.02 comment 1, at 230–32 (Official Draft and Revised Comments 1985); W. LaFave & A. Scott, *Handbook on Criminal Law* § 28, at 202 (1972). We also recognize that the terms "general intent" and "specific intent" have not been altogether free of difficulty in the criminal law. But we do not believe that total abandonment of the terms will serve to clarify this vital corner of the law. We believe, on the contrary, that the term "specific intent" has utility in describing a culpable mental state, or mind set, that describes a required purpose, knowledge, attitude, or motive, in addition to the mere volitional act, such as pulling a trigger, which has no inherent moral value but causes a killing. A subjective purpose, attitude, motive, or knowledge of acts or consequences makes the critical moral difference in the various degrees of homicide. The second degree murder statute, for example, requires (1) an intent or purpose to kill; or (2) an

intent to inflict grievous bodily harm; or (3) knowledge that one's conduct is so threatening to life, that it is highly likely to result in death. For want of a better term, and because of its historic use in the criminal law, we continue to use the term "specific intent" to refer to such mind sets, even though the term "specific intent" is sometimes confused with general intent (or volitional act) and implies an actual intent, when in reality its meaning, as a term of art, also includes mental states that are not intentional. Because the term "specific intent" has an accepted meaning as a term of art and because that term also has special significance in connection with the diminished capacity defense, we decline to abandon it totally. *See State v. DePlonty*, 749 P.2d 621, 625 n. 3 (Utah 1987); *State v. Miller*, 677 P.2d 1129, 1131–32 (Utah 1984); *State v. Wood*, 648 P.2d 71, 90 (Utah), *cert. denied*, 459 U.S. 988, 103 S.Ct. 341, 74 L.Ed.2d 383 (1982); *State v. Sessions*, 645 P.2d 643, 646–47 (Utah 1982).

expressly defined in terms of the specific mental state required.

■ Defendant also argues that *Bolsinger,* 699 P.2d 1214, requires an instruction that a specific intent to kill is necessary to convict of depraved indifference murder.[4] Defendant's reading of *Bolsinger* is incorrect. *Bolsinger* did not hold that depraved indifference murder requires a specific intent to kill, by which defendant apparently means a purposeful killing. Rather, the Court stated that depraved murder requires "a knowing doing of an uncalled-for act ... which is so heinous as to be *equivalent* to a 'specific intent' [or a purpose] to kill." (Emphasis added.)[5] *Id.* at 1220. This statement was part of the Court's explanation of the nature of the depravity necessary for depraved murder. We continue to adhere to that concept.

### D. Second Degree Murder: Depraved Indifference

Defendant asserts that instruction Nos. 19 and 23 are inconsistent. Instruction No. 19 set forth the statutory definitions of intentional, knowing, and reckless conduct, which were taken essentially from § 76–2–103.[6] The instruction was correct. Instruction No. 23 sought to explain the term "depraved indifference":

The term "depraved indifference" has been used previously in these instructions. The term is not specifically defined by statute. Thus, the phrase "depraved indifference" is a concept which must be left largely to the experience and common sense of the jury.

To engage in conduct with a "depraved indifference to human life," a person must do more than act "recklessly," but he need not have as his conscious objective or desire to cause the result; nor, need he be aware that his conduct is reasonably certain to cause the result.

Rather, the greatness of the risk which the defendant's actions create and the

lack of justification for the creation of the risk is the test to be applied in determining whether the defendant's conduct evidences a "depraved indifference to human life."

This instruction defines "depraved indifference" partially in terms of two different elements of depraved indifference murder, the requisite culpable mental state and the "depraved indifference to human life" element.

■ The term "depraved indifference to human life" does not refer to the mens rea, or subjective culpable mental state, of depraved murder,[7] but rather to an objective reasonable person standard as to the value of human life. Thus, the element of depraved indifference must be based on an objective evaluation of the magnitude of the risk created and of all the circumstances surrounding the killing. *Bolsinger,* 699 P.2d at 1218–20; *Fontana,* 680 P.2d at 1044–48. *See also People v. LeGrand,* 61 A.D.2d 815, 402 N.Y.S.2d 209, *cert. denied,* 439 U.S. 835, 99 S.Ct. 117, 58 L.Ed.2d 130 (1978).

Paragraph one of instruction No. 23 told the jury that the term "depraved indifference" was to be defined according to the jury's "experience and common sense." While experience and common sense no doubt influence every juror's judgment as a practical matter, the jury should be instructed as to the legal meaning of depraved indifference, and that meaning is to be derived from the purpose the term is intended to serve in the context of the homicide statutes. Clearly, depraved indifference is not proved by proof of a single, unanticipated tragic result. *Bolsinger,* 699 P.2d at 1220. Depraved indifference means an utter callousness toward the value of human life and a complete and total indifference as to whether one's conduct will create the requisite risk of death (discussed below) of another. *See Bolsinger,*

---

**4.** For the sake of brevity, we hereafter refer to depraved indifference murder under § 76–5–203(1)(c) as "depraved murder."

**5.** All emphasis in this opinion is added and no further indication of that fact will be given.

**6.** See note 8, *infra.*

**7.** See note 8, *infra.*

699 P.2d at 1220; Model Penal Code § 210.2 comment 4, at 22 (Official Draft and Revised Comments 1980). We disapprove of the instruction as given because common experience and common sense do not convey the statutory sense of the term, nor would they impart a reasonably uniform meaning to that term.

■ Defendant correctly points out that paragraph two of instruction No. 23 did not state that a defendant must consciously act and *knowingly* create a grave risk of death, as required by *Fontana,* 680 P.2d at 1044–48. However, the intended thrust of instruction No. 23 was to explain the degree of risk to human life that a defendant's conduct must create to be guilty of depraved murder and to differentiate the different degree of risk required for reckless manslaughter. Another instruction, set forth the requirement that the defendant act knowingly.

■ Paragraph two of instruction No. 23 states that depraved indifference does not mean either recklessness or a purpose or desire to kill or conduct that is reasonably certain to cause death. Insofar as the instruction focuses on the mental state, it is not incorrect to state that depraved indifference falls between purposeful or intentional conduct on the one hand and reckless conduct on the other. While that is correct, depraved indifference focuses on the gravity of the risk to human life that is created and the callousness of attitude toward that risk. The deficiency in the instruction was not objected to and, in any event, could not have operated to the detriment of defendant.

■ The second paragraph of instruction No. 23 did not affirmatively describe the gravity or degree of risk to human life that the defendant's conduct must knowingly create; rather, the instruction stated what the risk need not be. Technically, the instruction was not incorrect. However, the instruction should define the term "grave risk of death."

In light of the less than pellucid treatment of the elements of depraved murder reflected above, we once again address the elements of depraved indifference murder. The statutory definition of depraved murder under § 76–5–203(1)(c), when literally read, requires proof that the defendant did an act which he knew created a grave risk of death to another and showed a depraved indifference to human life and resulted in the death of a human being. *State v. Fontana,* 680 P.2d at 1047; *see also State v. Thompson,* 110 Utah 113, 170 P.2d 153 (1946) (common law depraved mind murder). Despite its surface simplicity, the statute has given rise to several difficulties.

To understand the legal elements of depraved murder, it is necessary to trace briefly the development of the law under § 76–5–203(1)(c). The Legislature initially defined depraved murder as a homicide committed while the defendant was *"recklessly engaged in conduct which creates a grave risk of death to another"* under circumstances evidencing depraved indifference to human life, Utah Code Ann. § 76–5–203 (1978) (amended 1979).

The criminal code defines the term "reckless" to mean a mental state in which one "is aware of but consciously disregards *a substantial and unjustifiable risk* that the circumstances exist or that the result will occur." Utah Code Ann. § 76–2–103(3) (1978).[8] Reckless manslaughter, therefore,

---

8. Section 76–2–103 states:
A person engages in conduct:
(1) Intentionally, or with intent or willfully with respect to the nature of his conduct or to a result of his conduct, when it is his conscious objective or desire to engage in the conduct or cause the result.
(2) Knowingly, or with knowledge, with respect to his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or the existing circumstances. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.
(3) Recklessly, or maliciously, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would

is committed under § 76–5–205 when one causes a death by engaging in conduct which the actor knows creates a "substantial and unjustifiable risk" of death. By using the term "recklessly" in the second degree murder statute, the Legislature in effect duplicated the mental element of manslaughter. Furthermore, inclusion of the word "recklessly," as defined in § 76–2–103(3) in the depraved indifference murder provision, § 76–5–203(1)(c), produced the nonsensical proposition that a defendant had to cause a "substantial and unjustifiable risk" of "a grave risk of death to another."

To abolish the overlap between manslaughter and depraved murder, the Legislature deleted the word "recklessly" from § 76–5–203(1)(c) in 1979, *State v. Bindrup,* 655 P.2d 674 (Utah 1982), but failed to add any other culpable mental state for depraved murder. In *Fontana,* 680 P.2d at 1047, we remedied the omission and held that a defendant had to act knowingly to create a "grave risk of death to another." That means that to be convicted, a defendant must know the nature of his conduct, must know the circumstances that give rise to the risk of death, and must know that the risk constitutes a grave risk of death.

Even after *Fontana,* however, depraved murder and reckless manslaughter had so much overlap that they both would have applied to the same conduct. *See Recent Developments in Utah Law,* 1985 Utah L.Rev. 131, 150–56; Note, *State v. Fontana; An Illusory Solution to Utah's De-*

*praved Indifference Murder Mens Rea Problem,* 12 J.Contemp.L. 177, 186–87 (1986). That is so because the term "reckless" requires a "conscious awareness of a risk," and conscious awareness of a risk (manslaughter) is the same as "knowing" that a risk exists (depraved murder). Furthermore, there is no meaningful difference between a "substantial and unjustifiable risk" of death (manslaughter) and a "grave risk of death" (depraved murder). Whatever slight degree of difference does exist is, as a practical matter, essentially wiped out by the horror of the irreversible actuality, the death of a person.[9] Certainly the difference in law between a substantial risk of death and a grave risk of death should be explained to a jury in meaningful and understandable terms.

Furthermore, the difference between the crimes of manslaughter and depraved murder must be intelligible to avoid capriciousness in the prosecution of the crimes. Depraved murder requires greater culpability than reckless manslaughter. *People v. Register,* 90 A.D.2d 972, 456 N.Y.S.2d 562 (1982), *aff'd,* 60 N.Y.2d 270, 457 N.E.2d 704, 469 N.Y.S.2d 599 (1983), *cert. denied,* 466 U.S. 953, 104 S.Ct. 2159, 80 L.Ed.2d 544 (1984). *See also Bindrup,* 655 P.2d at 676. It would be wholly out of harmony with the basic structure, and the moral and penal premises, of the criminal code to impose liability for a form of second degree murder that has no greater moral culpability than is required for reckless manslaughter.[10] The instructions should, therefore,

---

exercise under all the circumstances as viewed from the actor's standpoint.

(4) With criminal negligence or is criminally negligent with respect to circumstances surrounding his conduct or the result of his conduct when he ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise in all the circumstances as viewed from the actor's standpoint.

9. The magnitude of a given risk is determined in part by the probability that the risk will be actualized and in part by the seriousness of the consequence if the risk is actualized. Thus, a risk may be deemed of no great importance because it is not likely to occur or because, even

if it does occur, the consequence is not serious. If the potential of a risk is death, that risk is always serious. Therefore, only some likelihood that death will occur might create for most people a "substantial and unjustifiable risk" and even a "grave risk" of death. The law must, therefore, distinguish meaningfully between the kind of risk that gives rise to murder and the kind that gives rise to manslaughter in light of the general requirement of an unjustifiable risk of death in both cases.

10. Utah Code Ann. § 76–1–104 (1978) states:
The provisions of this code shall be construed in accordance with these general purposes.
(1) Forbid and prevent the commission of offenses;
(2) Define adequately the conduct and mental state which constitute each offense and safe-

inform a jury that the *probability* of the risk of death must be higher for depraved murder than for manslaughter. Thus, a trial judge should instruct the jury that the term "grave risk of death" (murder) means a greater risk than a "substantial and unjustifiable" risk (i.e., manslaughter). Further, a jury should be instructed that a "grave risk of death" means a *highly likely probability* that death will result from a risk that the defendant knowingly creates. This standard is less than what is required for an intentional or knowing murder, but greater than what is required for reckless manslaughter.

In sum, the jury should be instructed that to convict of depraved murder it must find (1) that the defendant acted knowingly (2) in creating a grave risk of death, (3) that the defendant knew the risk of death was grave, (4) which means a highly likely probability of death, and (5) that the conduct evidenced an utter callousness and indifference toward human life.

Contrary to defendant's contention, the trial court made clear that defendant had to act knowingly in creating a grave risk of death. And while the gravity of the risk of death was not explained with quite the precision set out here, the instructions, nevertheless, were not essentially wrong, and we do not believe the jury was misled. In any event, 107 stab wounds is sufficient evidence that defendant created a highly likely probability of death. Any error in the instructions was harmless.

### E. Instructions Regarding Self-defense, Robbery, and Burglary

Defendant next argues that the trial judge erred in giving instruction No. 32 on self-defense, which stated in part:

A person is not justified in using force under the circumstances specified ... [above] if he:

(a) initially provokes the use of force against himself with the intent to use

force as an excuse to inflict bodily harm upon the assailant; or

(b) is attempting to commit, committing or fleeing after commission or attempted commission of a felony; or

(c) was the aggressor or was engaged in combat by agreement unless he withdraws from the encounter and effectively communicates to such other person his intent to do so and the other notwithstanding continues or threatens to continue the use of unlawful force.

*See* Utah Code Ann. § 76–2–402(2)(a), (b), (c) (1978). Defendant asserts that because there was no evidence to support subsections (a), (b), and (c) of the instruction, they were unnecessary, misleading, and prejudicial.

It is error to give an instruction if there is no evidence to support it and if it could be misleading. *See State v. McCardell*, 652 P.2d 942, 945 (Utah 1982); *State v. Pacheco*, 27 Utah 2d 281, 495 P.2d 808 (1972). This instruction was not misleading, and it was pertinent to the facts. The jury heard evidence that defendant went to the victim's home to rob and kill her. Under the circumstances, it was appropriate to instruct the jury that defendant could not claim self-defense if he provoked the use of force, was committing or fleeing after committing a crime, or was the aggressor. Just as a defendant is entitled to have his theory presented to the jury if there is evidence to support it, so is the State entitled to have its theory presented if there is evidence to support it. There was such evidence here.

Defendant also attacks the trial court's instructions giving the elements of robbery and burglary. Ordinarily, the jury should not be instructed about crimes not charged in the information. *State v. Booker*, 197 Kan. 13, 415 P.2d 411 (1966). The delivery of the robbery and burglary in-

---

guard conduct that is without fault from condemnation as criminal.
(3) Prescribe penalties which are proportionate to the seriousness of offenses and which permit recognition or differences in rehabili-

tation possibilities among individual offenders.
(4) Prevent arbitrary or oppressive treatment of persons accused or convicted of offenses.

structions followed immediately the instruction on self-defense. Since the instruction on self-defense stated that the defense was not available if defendant was committing or fleeing from the commission of a burglary or robbery, their relevance to that defense was reasonably evident. The trial judge should have made explicit the connection between the instruction on self-defense and the burglary and robbery instructions, but the error clearly was not prejudicial.

■■■ Defendant also argues that the prosecutor made improper references in his closing argument to burglary and robbery. The prosecutor referred to burglary and robbery as evidence that defendant was thinking rationally during the crime, was not under the influence of drugs, and was not entitled to the defense of self-defense. We do not believe that the references constituted error on the facts of this case since the prosecution was entitled to argue that defendant's motivation was to steal drugs.

*F. Instructions on Voluntary Intoxication*

■■■ Defendant argues that instruction Nos. 28, 28a and 28b, which dealt with the defense of intoxication, are inconsistent. Instruction No. 28 states:

Voluntary intoxication is not a defense to a criminal charge unless such intoxication negates the existence of the mental state which is an element of the offense; however, if recklessness or criminal negligence establishes an element of an offense and the actor is unaware of the risk because of voluntary intoxication, his unawareness is not a defense.

Instruction No. 28a states:

Voluntary intoxication as used in these instructions may include being under the influence of cocaine and/or marijuana.

If the degree of intoxication is great enough it may negate the mental elements required for proof of Murder in the Second Degree, in which case you must acquit the defendant of that charge.

Instruction No. 28b states:

In the State of Utah the statute relative to mental illness and the influence of controlled substances is as follows:

It is a defense to a prosecution under any statute or ordinance that the defendant, as a result of mental illness, lacked the mental state required as an element of the offense charged. Mental illness shall not otherwise constitute a defense.

A person who is under the influence of voluntarily consumed or injected alcohol, controlled substances, or volatile substances at the time of the alleged offense shall not thereby be deemed to be excused from criminal responsibility.

Mental illness means a mental disease or defect. Mental defect may be a congenital condition or one the result of injury or a residual effect of physical or mental disease.

Defendant argues that paragraph 2 of instruction No. 28b, which states that a person who is intoxicated by alcohol or other substances is not "excused from criminal responsibility," is inconsistent with instruction Nos. 28 and 28a and that it is incorrect.

We disagree. Instructions 28 and 28a were based on § 76–2–306 (1978),[11] and they correctly state that voluntary intoxication may negate the mental element of a crime, except for the "awareness" element of recklessness and negligence, and may be a defense to second degree murder. *See generally State v. Wood,* 648 P.2d 71, 89–90 (Utah), *cert. denied,* 459 U.S. 988, 103 S.Ct. 341, 74 L.Ed.2d 383 (1982); *State v.*

**11.** Utah Code Ann. § 76–2–306 provides:
Voluntary intoxication shall not be a defense to a criminal charge unless such intoxication negates the existence of the mental state which is an element of the offense; however,

if recklessness or criminal negligence establishes an element of an offense and the actor is unaware of the risk because of voluntary intoxication, his unawareness is immaterial in a prosecution for that offense.

*Sessions,* 645 P.2d 643 (Utah 1982). Thus, intoxication, even when sufficient to negate a culpable mental state, does not absolve a person from all criminal liability. Instruction No. 28b was taken from § 76–2–305 (Supp.1988) [12] and correctly states that a person who is under the influence of voluntarily consumed alcohol or controlled substances at the time of the alleged offense shall not thereby be deemed to be excused from criminal responsibility. Thus, the jury might have acquitted of second degree murder because of intoxication, but it still would have had to convict on manslaughter, as instructions 28 and 28a indicated.

Instruction 28b simply reiterated the statutory language of § 76–2–305(3). The instruction was not incorrect, but it failed to set forth a complete statement of the proposition. Thus, the instruction, although somewhat misleading, did not constitute prejudicial error. Nevertheless, we note that the instruction illustrates the danger in the trial court's instructing uncritically in the words of a statute.

Defendant also argues that instruction No. 28b should not have been given because he did not claim to be not guilty by reason of insanity. However, defendant placed his mental state in issue by presenting evidence of toxic cocaine psychosis, apparently to support the partial defense of diminished capacity. For that reason, the instruction on mental illness was appropriate.

### G. Defendant's Proposed "Theory of the Case" Instruction

■ Defendant also attacks the trial court's refusal to give an instruction explaining defendant's "theory of the case." Instructions generally ought to be drafted with a view to assisting the jury to understand the issues they have to decide. Too often instructions simply repeat arid, dense statutory language that the trial judge does not relate concretely to the issues in a case. Nevertheless, the framing of instructions lies in the trial judge's discretion. Here, the trial judge was asked to give highly tendentious and argumentative "contention" instructions. He did not err in refusing to do so. The court's instructions on manslaughter, self-defense, and voluntary intoxication gave defendant the legal framework for his theory of the case, and counsel's arguments to the jury clearly elucidated the factual and legal issues from defendant's point of view. *See State v. Torres,* 619 P.2d 694, 695 (Utah 1980).

### H. Instruction on Lesser Included Offense of Negligent Homicide

■ Finally, defendant attacks the trial judge's refusal to give defendant's requested instruction on the lesser included offense of negligent homicide. *State v. Baker,* 671 P.2d 152, 157–59 (Utah 1983), held that a defendant's requested lesser included offense instruction must be given when there is some evidence which supports the theory asserted by defendant. The requirement is more than a procedural nicety; it is rooted in defendant's constitutional right to a jury trial. A defendant is entitled to have his legal theory of the case placed before the jury if it would not be superfluous to do so because of an absence of any evidence to support the theory. Sometimes prosecutors overcharge, and sometimes expected evidence just does not

---

**12.** Utah Code Ann. § 76–2–305 provides:

(1) It is a defense to a prosecution under any statute or ordinance that the defendant, as a result of mental illness, lacked the mental state required as an element of the offense charged. Mental illness is not otherwise a defense.

(2) The defense defined in this section includes the defenses known as "insanity" and "diminished mental capacity."

(3) A person who is under the influence of voluntarily consumed or injected alcohol, controlled substances, or volatile substances at the time of the alleged offense is not excused from criminal responsibility on the basis of mental illness.

(4) "Mental illness" means a mental disease or defect. A mental defect may be a congenital condition or one the result of injury or a residual effect of a physical or mental disease. Mental illness does not mean a personality or character disorder or abnormality manifested only by repeated criminal conduct.

materialize. In such cases, instructions on lesser offenses may be essential to avoid injustice. Furthermore, juries should not be precluded from determining how criminal conduct should be characterized and judged. In all events, a defendant has an absolute right to have the jury instructed on a lesser crime, as long as there is some evidence to support it.

Negligent homicide is conceptually related to reckless manslaughter. Reckless manslaughter requires that a defendant be aware of the risk of death. Negligent homicide requires only that a defendant "ought to be aware of a substantial and unjustifiable" risk of death. Utah Code Ann. § 76–2–103(4) (1978). The sole difference between reckless manslaughter and negligent homicide is whether the defendant actually knew of the risk of death or simply was not, but should have been, aware. *Boggess v. State*, 655 P.2d 654, 656–58 (Utah 1982) (Stewart, J., concurring). In both cases, a defendant's conduct must be "a gross deviation" from the standard of care exercised by an ordinary person. Thus, ordinary negligence, which is the basis for a civil action for damages, is not sufficient to constitute criminal negligence.

Here, 107 stab wounds bespeak at least a knowledge of the risk of death, if not an actual intent to kill. Although the line between the risks that a person is in fact aware of and the risks that he ought to be aware of may well be imprecise in some cases, that is not so here. Even if the jury had believed that defendant did not know of the great risk of death because of drug intoxication, that would not have relieved him of liability for manslaughter. In short, on the facts of this case, there was no evidence that would support defendant's theory of negligent homicide. Furthermore, since the jury convicted of second degree murder despite the fact that an instruction was given on the lesser included offense of manslaughter, failure to give a negligent homicide instruction was, at the very best, harmless error.

## IV. EFFECTIVE ASSISTANCE OF COUNSEL

█ Standiford also argues that his right to effective assistance of counsel was violated when the trial court allowed Dr. Lincoln Clark, a psychiatrist who had briefly consulted with defense counsel, to testify for the prosecution. The right to effective assistance of counsel may be infringed when an expert witness is consulted by a defendant or by his attorney for assistance in preparing a defense and communications made to that expert are used against the defendant. *See United States v. Alvarez*, 519 F.2d 1036 (3rd Cir.1975); *United States v. Layton*, 90 F.R.D. 520 (N.D.Cal. 1981); *Pouncy v. State*, 353 So.2d 640 (Fla. Ct.App.1977). *But see Noggle v. Marshall*, 706 F.2d 1408 (6th Cir.), *cert. denied*, 464 U.S. 1010, 104 S.Ct. 530, 78 L.Ed.2d 712 (1983); *United States ex rel. Edney v. Smith*, 425 F.Supp. 1038 (E.D.N.Y.1976), *aff'd*, 556 F.2d 556 (2d Cir.), *cert. denied*, 431 U.S. 958, 97 S.Ct. 2683, 53 L.Ed.2d 276 (1977). We believe that the same principle covers confidential information given an expert for the purpose of initially determining whether the expert can assist in the defense of a case.

Early in the defense preparation of the case, Dr. Clark was given defendant's file to review to determine whether he could provide helpful testimony for defendant. The file contained police reports and a transcribed typewritten confession defendant had given to the police. Neither the confession nor the other documents were privileged or confidential. Nor were they elicited in reliance on the attorney-client privilege. Defendant believes that his handwritten version of the facts, which had been prepared for his first attorney, Mr. McCaughey, might also have been in the file. Dr. Clark testified that he remembered reviewing only typewritten fact statements and police reports and that he did not review defendant's handwritten statement or any other handwritten statements. The trial court apparently concluded that Dr. Clark reviewed no confidential communications.

Dr. Clark also stated that he had discussed the essential facts of the case very briefly with defense attorney Hansen and that somewhere along the line attorney Hansen had mentioned a self-defense theory similar to that which was argued at trial. At trial, Dr. Clark ultimately expressed his opinion that defendant's version of the facts was a combination of partial truths and lies developed in response to the charges against him.

There is nothing in the conversations between defendant's attorney and Dr. Clark that could have influenced Dr. Clark's testimony for the prosecution. Clearly, it would have been preferable for Dr. Clark not to have testified at all, once he consulted with defendant's attorney. However, we cannot say that the trial court erred in allowing Dr. Clark to testify. For all that appears, Dr. Clark based his testimony solely on evidence that was adduced at trial by others. In sum, Dr. Clark's testimony did not affect defendant's right to the effective assistance of counsel. *See Weatherford v. Bursey*, 429 U.S. 545, 557–58, 97 S.Ct. 837, 844–45, 51 L.Ed.2d 30 (1977); *State v. Romero*, 624 P.2d 699, 704 (Utah 1981). Defendant's intent to rely on the defense of self-defense was evident from his initial statement to police. The conversation between Dr. Clark and attorney Hansen gave the prosecution no insight into the trial tactics of the defense that was not obvious from the police reports and the confession given to the police. Defendant was not entitled to a mistrial, a dismissal of the case because of Dr. Clark's conduct, or an order suppressing his testimony.

## V. OTHER CONTENTIONS

Finally, defendant argues that the evidence is insufficient to support a conviction for second degree murder. He relies upon his testimony that he was attacked by Mrs. Wood and the brutality of the killing as evidence that the crime was committed in the heat of passion and did not therefore constitute second degree murder. The contention is without merit.

Defendant also refers to a host of other claimed errors as a ground for reversal. In most cases, he has not indicated that a proper objection was made at trial. In numerous instances, he simply states that various errors were made, without attempting to demonstrate the error by argument or by authority. The claims that might properly be before this Court and are not addressed above have been reviewed and found to be without merit. The others are deemed waived.

AFFIRMED.

DURHAM and ZIMMERMAN, JJ., concur.

HALL, Chief Justice: (concurring specially).

I concur in all portions of the majority opinion except to any extent that it implies in section IIIB that Utah's manslaughter statute contemplates that emotional disturbances may be triggered by internal stimuli or that a defendant's subjective state is relevant in determining whether the explanation or excuse for the disturbance is reasonable.[1]

HOWE, Associate C.J., concurs in the concurring opinion of HALL, C.J.

**1.** *See State v. Bishop*, 753 P.2d 439, 467–72 (Utah 1988) (proper construction of Utah Code Ann. § 76–5–205(1)(b) (1978 and Supp.1988).