STATE of Utah, Plaintiff and
Respondent,

v.

DeLyle V. WATTS, Defendant
and Appellant.

No. 18847.

Supreme Court of Utah.

Dec. 28, 1983.

Sumner J. Hatch, Salt Lake City, for
defendant and appellant.

Robert N. Parrish, Salt Lake City, for
plaintiff and respondent.

HOWE, Justice:

A jury convicted the defendant of second
degree murder in the death of fourteen
month old Christopher Goodman, after the
trial judge denied defendant's motions to
dismiss and to direct a verdict of acquittal.
Defendant claims that the evidence was
insufficient to link him to the crime and
thus the trial court should not have sub-
mitted the case to the jury. We recapitu-
late the facts in a light most favorable to
the jury verdict.

Defendant and Deborah Goodman, moth-
er of Christopher and of another son, three
year old Adam, met in April of 1981.
About September 12, 1981, defendant and
Deborah moved into a home together.
Deborah had a part-time job, and defendant
babysat both children during her absence.
One incident, requiring medical attention,
had happened shortly before the couple
established a common household. On Sep-
tember 1, defendant was alone with Chris-
topher. Deborah returned home from the

doctor just moments after defendant had pushed Christopher with sufficient force and pressure to lift him off the ground and cause him to fall on his head. The resulting triangular bruise extended from the bridge of his nose to the hairline. The child vomited two hours later and the mother took him to the doctor because she feared a concussion. Defendant's explanation for that incident was that Christopher "didn't want his mother to leave and had been a little monster." He was picking at the plants, rolling the records and throwing food on the floor. Defendant had become upset. Photographs admitted into evidence showed that on that day Christopher had three bruises on his face and two on his back. Defendant left Deborah's home immediately after the incident.

On Saturday, September 19, Deborah left for work around 10:00 a.m. and defendant testified that he awoke the children shortly thereafter. He changed Christopher after breakfast when he noticed his runny diaper. Defendant admitted that he did not like changing diapers and that he was upset with the baby, but not enough to hurt him. He put him in the bathtub to rinse him off with a shower massage. The child screamed when he sprayed him but stopped after defendant finished. Deborah's two brothers dropped in around 11:30 a.m. Defendant sprayed Christopher once more with the showerhead before he put the children down for a nap. Purportedly Deborah's brothers were there at that time. When Deborah returned home around 2:30 or 3:00 p.m. she noticed that the children were sleeping longer than normal. Defendant then told her that the thump they had heard in the children's bedroom directly above theirs around 6:00 a.m. earlier that day probably was Christopher falling out of his crib; that he was on the floor outside his bed when defendant picked him up that morning. Deborah went to wake the children at 4:30 p.m. and noticed that Christopher had just vomited. The child had been well the night before when she had last seen him. Deborah took his temperature and it registered at 101°. She bathed him and noticed three scratches near his navel. She and the defendant felt the child's stomach to see if he was hurting. The child winced and they took their hands off. Christopher was listless and threw up twice more that night.

On Sunday, September 20, Christopher drifted in and out of sleep. He had no bowel movement but was grunting. He could not hold food down. He continued vomiting. His temperature was 102°. That night he had a fine blue or silver line around his lips. His stomach started to get hard and swollen. Defendant left the house after he had a quarrel with Deborah over whether they should have moved in together. He spent the night outdoors and went to his mother's house the next morning.

On Monday, September 21, Christopher's condition worsened. A blue bruise started to appear around the navel. His stomach was hard and hot and his feet were cold. Blue blotches appeared on his legs. Deborah called the doctor in the early afternoon and took the child to the hospital around sunset. Christopher died on the way there.

The night after Christopher died, Deborah had a conversation with the defendant in which he said "I hope I didn't hurt him when I put my hand on his stomach."

The State Medical Examiner's credentials included a publication he had written on blunt force injuries. He testified that an external autopsy performed on Christopher on September 22 revealed numerous bruises, predominantly on his left side, estimated to be 3 to 4 days old. An internal examination revealed three bruises of the scalp, two in the area of the left ear and one on top of the head. There was a depressed skull fracture above and behind the left ear, apparently the result of a blow struck by the corner of an object, consistent with the corners of the showerhead. The fracture and bruises were 3 to 4 days old. The skull fracture had to have been caused by the application of a great deal of force. It was a definite coup injury, an injury medically defined as resulting from a moving object hitting the stationary head.

An internal examination of the child's abdomen revealed a perforation of the small intestine with resulting peritonitis, again 3 to 4 days old. The rupture was caused by a severe blow from an object sustained in the area of the external bruise near the umbilicus, again consistent with the size of the showerhead. The medical examiner determined the cause of death as peritonitis, probably contributed to by the head injury, and the manner of death as a homicide. The general health of the child, apart from the separate injuries to the head, face, front and back of the body, was good. There was no evidence of any natural disease.

Reduced to essentials, the issue is simply whether there was evidence adduced at trial from which the jury could have found the defendant guilty beyond a reasonable doubt of murder in the second degree. Contradictory testimony alone is not sufficient to disturb a jury verdict. To overturn a verdict on appeal for insufficiency of evidence, this Court must find that reasonable minds must necessarily entertain a reasonable doubt as to the defendant's guilt. *State v. Petree*, Utah, 659 P.2d 443 (1983); *State v. Nebeker*, Utah, 657 P.2d 1359 (1983); *State v. Howell*, Utah, 649 P.2d 91 (1982). Nor is it our function to determine guilt or innocence or the credibility of conflicting evidence and the reasonable inferences to be drawn therefrom. *State v. McCardell*, Utah, 652 P.2d 942 (1982); *State v. Wilson*, Utah, 565 P.2d 66 (1977); *State v. Romero*, Utah, 554 P.2d 216 (1976).

The defendant assails the jury verdict on the ground that there was not a scintilla of evidence in the record from which the jury could have found the defendant guilty of murder in the second degree. He maintains that the jury failed to consider the included crimes of manslaughter or negligent homicide, but fails to buttress that contention by more than bald assertions.

The jury was instructed on the elements of murder in the second degree, manslaughter and negligent homicide. U.C.A., 1953, §§ 76–5–203, 76–5–205 and 76–5–206 respectively. In defining negligent homicide for the jury, the court instructed it that "criminal negligence," was the *failure* to perceive a risk, a deviation from ordinary care which is marked by conduct that is of an utterly careless nature with an indifference to consequences. To find the defendant guilty of the crime of manslaughter, the jury was instructed that it must find the defendant to have acted unlawfully and recklessly, or that he acted under the influence of extreme mental or emotional disturbance for which there was a reasonable excuse. The jury was instructed on those elements of murder in the second degree applicable to this defendant set out in § 76–5–203 as follows:

Criminal homicide constitutes murder in the second degree if the actor:

(a) Intentionally or knowingly causes the death of another; or

(b) Intending to cause serious bodily injury to another, he commits an act clearly dangerous to human life that causes the death of another; or

(c) Acting under circumstances evidencing a depraved indifference to human life, he engaged in conduct which creates a grave risk of death to another and thereby causes the death of another;

The essential terms of that section, as well as the lesser included offenses just referred to, were defined for the jury in language directly borrowed from the statute, gainsaying defendant's inference that no consideration was given to the instructions on manslaughter and negligent homicide. It thus became the task of the jury to assess the manifestation of the defendant's conduct under various distinct degrees of culpability: (1) his failure to perceive the risk of death, § 76–2–103(4), constituting negligent homicide; (2) his conscious awareness of, but equally conscious disregard for, the probable consequences of his conduct, § 76–2–103(3), constituting manslaughter; and (3) intent, knowledge or "depraved indifference" as set out under § 76–5–203 ante. "Depraved indifference to human life" is a term not defined in the statute, *State v. Day*, Utah, 572 P.2d 703

(1977), but defined for the jury as "evidenced by ill will, hatred, spite or evil intent. A 'depraved' mind is a mind which has become inflamed by some cause to such a degree that it ceases to care for human life and safety." ˙

■ It is the exclusive province of the jury to grade the degree of culpability. Intent need not be directly proved but may be inferred. *State v. Wardle*, Utah, 564 P.2d 764 (1977). The conduct and circumstances manifesting depraved indifference to human life are measured by the greatness of the risk and the lack of justification for the creation of that risk. *State v. Nicholson*, Utah, 585 P.2d 60 (1978) (Wilkins, J., concurring). The defendant in *People v. Drumheller*, 15 Ill.App.3d 418, 304 N.E.2d 455 (1973) appealed on similar grounds as the defendant here. It was established at trial there that the defendant had killed a fourteen month old child of his live-in girlfriend by hitting him with a fist in the stomach. Cause of death, similar to here, was acute diffused peritonitis resulting from an explosive rupture of the duodenum inflicted by external trauma. In upholding the murder verdict the court reasoned that

[i]t is not necessary to directly prove that [defendant] had an intent to kill, only that he voluntarily and willingly committed an act, the natural tendency of which was to destroy another's life. In such instances the intent can be implied or inferred from the character of the act [citations omitted]. Further, the fact that defendant, on three previous occasions, inflicted injuries upon the child, refutes the suggestion that his actions were accidental or reckless. His act formed sufficient basis for the jury to conclude beyond a reasonable doubt that the defendant knew or should have known that his conduct ... would create a strong probability of death or great bodily harm. We hold that this evidence sustains the jury's conclusion as to the required mental state. Granted, under given circumstances, a fatal blow from a bare fist may not be considered murder, but where disparity in size and strength

are so great, such disparity can warrant a conviction for murder.

*Id.* 304 N.E.2d at 457, 458. Accord *State v. Mendell*, 111 Ariz. 51, 523 P.2d 79 (1974).

■ Defendant incorrectly assumes that his mere denial of any criminal deed and the lack of direct evidence in this case mandates our reversing his conviction. But we cannot ignore that the pernicious acts of the child abuser are always attended by secrecy, denied by protestations of innocence, and "peculiarly identified by the marked discrepancy between the clinical or physical findings and the historical data provided by the [caretaker]." *State v. Tanner*, Utah, 675 P.2d 539 (1983). Nor are we unmindful of the propensity of knowledgeable intimates to stand mute for reasons known to them alone. But we have stated many times before that circumstantial evidence alone may be competent to establish the guilt of the accused, so long as it excludes every reasonable hypothesis other than the defendant's guilt. *State v. Clayton*, Utah, 646 P.2d 723 (1982), affirming second degree murder conviction on circumstantial evidence linking the defendant to the killing of a ninety-one year old man; *State v. John*, Utah, 586 P.2d 410 (1978), affirming manslaughter conviction for child killing where only circumstantial evidence pointed to the defendant; *State v. Schad*, 24 Utah 2d 255, 470 P.2d 246 (1970), affirming second degree murder for death resulting from mutual acts of sodomy, where defendant's guilt was inferred from circumstantial evidence only. Accord *State v. Blocher*, 10 Or.App. 357, 499 P.2d 1346 (1972), affirming second degree murder of defendant's stepchild, where child was in her exclusive care and discrepancies between statements on arrest and at trial, and inferences could have been drawn from circumstantial evidence; *People v. Weisberg*, 265 Cal.App.2d 476, 71 Cal.Rptr. 157 (1968), second degree murder affirmed where it was established by inference that a crime was committed and the accused was the perpetrator thereof; *People v. Fuentes*, 253 Cal.App.2d 969, 61 Cal. Rptr. 768 (1967), affirming manslaughter conviction where defendant who had exclu-

sive control over child did not admit to crime which was proved by circumstantial evidence; *State v. Herrera*, 236 Or. 1, 386 P.2d 448 (1963), affirming second degree murder of defendant accused of kicking twenty-three month old boy to death, where defendant was the only person who could have committed the crime.

■ The defendant claims that no corpus delicti exists, that the evidence is insufficient to prove that a crime was committed, and even if it were, that it was insufficient to prove the criminal agency of the defendant. In support of this proposition he cites *State v. Petree*, supra, and *State v. Bassett*, 27 Utah 2d 272, 495 P.2d 318 (1972). Both are clearly distinguishable. In *Bassett*, the State completely failed to adduce any evidence to show that either of the defendants committed any act or omission which resulted in the death of their baby, and the source of her injuries was never established. In *Petree*, the skeletal remains of the victim were found many months after her death, the result of a homicide. This Court found that the link coupling the defendant with the crime was too tenuous to uphold the conviction, where the only circumstantial evidence pointed to the defendant as the last person to have seen the victim alive, and to his dreams which seemed to inculpate him in her death. We held that although the corpus delicti had been established, the evidence was insufficient to convict the defendant of the crime. "The fabric of evidence against the defendant must cover the gap between the presumption of innocence and the proof of guilt." *Id.* at 444, 445.

Conversely here, there is no speculative leap across that gap to sustain the verdict. The jury was asked to decide three questions:

(1) Was Christopher's death a homicide or was it an accident? The medical examiner ruled that the death was a homicide, inconsistent with a pattern of injuries attributable to accidental falls. The jury was told that the majority of the bruises were found on the left side of Christopher's body. The jury observed that the defendant was right handed. The defendant claimed that the child fell on top of a toy from his crib which was two to two and one-half feet high, and thus punctured his intestines. The jury chose to believe the expert witness.

(2) If it was a homicide, who was responsible for the killing? Christopher was in good health when his mother put him to bed on the night of September 18. When she returned in the afternoon on September 19, he had vomited and had an elevated temperature. By nighttime his stomach was hard and swollen. During the absence of the mother, the defendant was the exclusive caretaker of the child and there was sufficient evidence, although disputed, that he was less than happy with that role. Although he denied having touched the child in any way, he admitted having sprayed the child with the showerhead and the configurations of two wounds matched the size and shape of the showerhead. The jury was not compelled to believe the story of a fall from the crib that was never corroborated. The seeming concern on the part of the defendant that he might have hurt the baby when he felt his stomach in the presence of the mother may well have been construed by the jury as a smokescreen, behind which he hid a more offensive touching. And there was evidence of prior use of excessive force on the child, grave enough in its implications to warrant taking pictures of the September 1 injuries. The jury again believed the expert witness that the skull fracture and intestinal injuries were caused by a great deal of force applied with a blunt instrument having the shape of the showerhead.

(3) If the defendant was the person responsible for the criminal homicide, how high was the degree of his culpability? The jury may well have determined that no twenty-two year old man could *fail* to perceive the gravity of the risk involved in angrily hitting a small defenseless baby with any object the size and shape of the showerhead, thus excluding negligent homicide. It may well have concluded that the defendant's conduct was more than

reckless and that he was not under the influence of emotional disturbances for which there was a reasonable explanation or excuse, thereby excluding manslaughter. It may well have been convinced that the defendant's conduct exhibited a depraved mind, inflamed to such a degree that it appeared to be indifferent to the life or safety of this child—making him guilty of murder in the second degree under the court's instruction, to which he has raised no objection. We decline to second guess the jury's perception of the defendant.

Affirmed.

HALL, C.J., and STEWART, OAKS and DURHAM, JJ., concur.