STATE of Utah, Plaintiff and Respondent,

v.

David R. WARDEN, Jr., M.D., Defendant and Appellant.

No. 880575–CA.

Court of Appeals of Utah.

Nov. 22, 1989.

Rehearing Denied Jan. 29, 1990.

Darwin C. Hansen, Bountiful, for defendant and appellant.

Melvin C. Wilson and Brian J. Namba, Farmington, for plaintiff and respondent.

## OPINION

Before BENCH, GREENWOOD and BULLOCK,[1] JJ.

BENCH, Judge:

Defendant appeals his jury conviction of negligent homicide, a class A misdemeanor, in violation of Utah Code Ann. § 76–5–206 (1978). We reverse the conviction.

## FACTS

Defendant David R. Warden, Jr., is a licensed and board-certified physician who began practicing family medicine in Kaysville, Utah, in 1968. As part of his practice, defendant provides obstetrical care, and estimates that he has attended approximately 2500 births, 300 of which have been home deliveries.

In September 1986, defendant was visited in his office by Joanne Young, who consulted defendant because she was pregnant out-of-wedlock and wanted to have her baby at home. Joanne testified that she was embarrassed about her pregnancy and "didn't want to have to go to the hospital and have people know." She also expressed a desire to keep the expenses of birth to a minimum. Defendant evaluated her for home delivery, considering the risks of her pregnancy, the proximity of hospital facilities, and the availability of family support to care for the infant and mother after birth. Defendant determined that Joanne's pregnancy was low risk and that medical facilities were nearby. He also learned that Joanne's mother, Ivy, was to be the

primary caretaker after birth and that Ivy had given birth at home to four of her seven children. Based on this evaluation, defendant decided that Joanne was a suitable candidate for home delivery and agreed to attend the birth. He also made arrangements to obtain Joanne's medical records from her previous doctor, and on the basis of that information and his own examination, calculated her delivery date to be in early December.

On the morning of November 7, Joanne began experiencing vaginal bleeding. Ivy called defendant, who was in Salt Lake City at the time. Defendant expressed concern that labor was beginning and advised Ivy to confine Joanne to bed and to contact him immediately if the bleeding became heavier or if strong contractions began. That afternoon, Ivy called defendant again and told him that the bleeding had stopped. She also told him that she had spoken with the father of the child and that he had told her that conception had occurred a month earlier than originally believed. Defendant testified that this information led him to think that the labor was not premature, and he advised her to call again as labor continued. Ivy did so that evening, reporting that Joanne was having occasional contractions. Defendant told her to call back when the contractions were three to five minutes apart. At about 10:15 p.m., Ivy informed defendant that the final stage of labor had begun. Defendant arrived at the house fifteen minutes later.

Shortly thereafter, Joanne gave breech birth to a male infant which appeared to be healthy, but weighed only an estimated four to five pounds. The baby exhibited some respiratory distress which defendant attributed to prematurity. Defendant testified that he suggested hospitalization of the infant to Ivy, but that Ivy was concerned because there was no health insurance to cover those expenses. (Ivy denied that she ever discussed with defendant hospitalization of the infant.) Defendant instructed Ivy how to position the infant to

---

1. J. Robert Bullock, Senior District Judge, sitting by special appointment pursuant to Utah Code Ann. § 78–3–24(10) (Supp.1989).

relieve some of the respiratory distress and showed Joanne how to nurse the baby. He also instructed Ivy to keep the child warm and to monitor the baby's temperature, color, and breathing. After instructing Ivy to call him if there were any changes in the baby's condition, defendant left at about 11:30 p.m.

During the night, Ivy moved Joanne and the baby into a warmer room. Ivy noticed that the child's hands and feet were "very blue," but did not call defendant. At 8:00 a.m., the baby appeared to have stopped breathing. Ivy attempted to resuscitate him for about twenty minutes, and apparently the infant responded. She then called defendant's office, but was told he was at home. When Ivy called defendant's home, his wife advised her he was not there, but would be in his office by 9:30 a.m. In neither call did she identify herself, leave a message, nor report that there was any emergency. She apparently was aware defendant was not inaccessible in such a situation, but did not make further attempts to reach him. She did not take the infant to the hospital or notify emergency services. She testified that in England, her native home, "you would have had to have a doctor's permission to have called an ambulance."

At about 8:30 a.m., Ivy called a friend but did not tell her that the child was having difficulty breathing. She also called her clergyman, but did not advise him until 9:30 or 10:00 a.m. that the baby was having respiratory difficulty. The clergyman called a local pediatrician, who arrived at the Youngs' home at about 10:30 a.m. only to find the infant "lifeless." The baby was taken to a hospital, but was pronounced dead shortly after arrival.

A postmortem examination revealed that the infant was born approximately six to seven weeks premature and had died from respiratory distress caused by prematurity of the lungs (hyaline membrane disease). Defendant subsequently was charged with one count of negligent homicide.

An initial jury trial ended in a mistrial prior to the rendition of a verdict. A second jury trial was held February 22–26, 1988, and defendant was convicted as charged. Defendant's motions to arrest judgment and for a new trial were denied.

## ISSUES

Defendant raises essentially two issues on appeal, arguing for a reversal of his conviction. He first claims that the State's expert witnesses were not qualified to testify as to the applicable medical standard of care. Second, he argues that there was insufficient evidence to establish that his conduct deviated significantly from the applicable standard of care and that there was a causal connection between his conduct and the baby's death.

## ANALYTICAL FRAMEWORK

 Conduct constituting the crime of negligent homicide occurs when an "actor, acting with criminal negligence, causes the death of another." Utah Code Ann. § 76–5–206(1) (1978). The culpable mental state for criminal negligence requires "only that a defendant 'ought to be aware of a substantial and unjustifiable risk' of death." *State v. Standiford*, 769 P.2d 254, 267 (Utah 1988) (quoting Utah Code Ann. § 76–2–103(4) (1978)); *see also* 2 C. Torcia, Wharton's Criminal Law § 168 (14th ed. 1979). Furthermore, "[t]he risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise in all the circumstances as viewed from the actor's standpoint." Utah Code Ann. § 76–2–103(4) (1978). Consequently, negligent homicide involves a defendant's perception of risk and necessarily requires an evaluation of his or her state of mind. *State v. Wessendorf*, 777 P.2d 523, 525–26 (Utah Ct.App. 1989). Whether a defendant negligently fails to perceive the risk is a question of fact for the jury. *See State v. Howard*, 597 P.2d 878, 881 (Utah 1979). However, the risk of death "must be of such a degree that an ordinary person would not ... fail to recognize it." *State v. Dyer*, 671 P.2d 142, 148 (Utah 1983).

Because the "failure to perceive the risk constitutes a *gross* deviation from the reasonable man standard," ordinary negligence adequate in the civil law is insufficient to constitute criminal negligence. *State v. Chavez*, 605 P.2d 1226, 1227 (Utah 1979); *see also Standiford*, 769 P.2d at 267; 2 C. Torcia, Wharton's Criminal Law § 168 (terms such as "criminal negligence" are intended to connote deviations from reasonableness significantly greater in degree than ordinary negligence). Thus, "[m]ere inattention or mistake in judgment resulting even in death of another is not criminal unless the quality of the act makes it so." *People v. Rodriguez*, 186 Cal. App.2d 433, 8 Cal.Rptr. 863, 868 (1960).

## EXPERT TESTIMONY

■ Defendant contends that expert testimony was required in this case to establish the "standard of care," but that the State's medical experts were not qualified to testify. On the other hand, the State argues that expert medical testimony was not required, and that it needed only to present "competent evidence to show the nature and degree of risk and the circumstances as viewed from the actor's standpoint." The State correctly observes that the "standard of care" in section 76–2–103(4) refers to the actor's mental state, as opposed to medical malpractice cases in which expert medical testimony is required to show the applicable standard of medical care. *See, e.g., Chadwick v. Nielsen*, 763 P.2d 817, 821 (Utah Ct.App.1988). It is also true that expert testimony is not required to prove the mental state of a criminal defendant accused of homicide. *See State v. Nicholson*, 585 P.2d 60, 63 (Utah 1978).

■ We conclude, however, that expert testimony was required in this case since such testimony was necessary to establish the nature and degree of risk. Section 76–5–206(1) requires the State to prove beyond a reasonable doubt that defendant's judgment was criminally deficient because

he failed to perceive a substantial risk that death could occur. Without an understanding of the nature and degree of risk, the jury could not determine whether the risk was substantial, and if so, whether defendant's failure to perceive it was grossly negligent. Unless the risk is one within the common knowledge and experience of laypersons, it is unlikely that a jury could make an informed determination of culpability.[2] We believe that expert testimony is required where criminal negligence is alleged and the nature and degree of risk are beyond the ken of the average layperson. *See, e.g., Ketchum v. Ward*, 422 F.Supp. 934 (W.D.N.Y.1976) (State's use of expert medical testimony at trial supplied sufficient evidence of criminal negligence for negligent homicide conviction in death of mother on whom physician had performed legal abortion).

■ Defendant argues that the State's expert medical witnesses did not qualify as experts because they do not attend home deliveries. The witnesses included two obstetrician/gynecologists, a pediatrician, and a neonatologist. Citing the medical malpractice case of *Burton v. Youngblood*, 711 P.2d 245, 248 (Utah 1985) (a practitioner of one school of medicine is not competent to testify as an expert against the practitioner of another school), defendant argues that the State's doctors were not qualified to testify because they were of a different school of medicine than defendant.

The qualification of an expert witness is a matter within the sound discretion of the trial court. *State v. Espinoza*, 723 P.2d 420, 421 (Utah 1986). There was evidence in the record that there is no board certification or recognized medical specialty in home delivery. There was also evidence that the medical principles applicable to the delivery of babies are applicable whether a birth occurs at home or in a hospital. In view of the record evidence, the trial court was within its discretion to qualify the State's medical witnesses as experts. *Cf.*

---

**2.** This is distinct from expert testimony as to the subjective intent of the defendant, i.e., "the actor's viewpoint," which need not be accepted by the court and which is ultimately a determination for the jury.

*Burton,* 711 P.2d at 249 (if methods and procedures of general plastic surgeon were shown to be identical to those of specialized plastic surgeon, one may testify against the other); *Wessel v. Erickson Landscaping Co.,* 711 P.2d 250, 253 (Utah 1985) (nothing precludes testimony from expert in another trade if the standard is the same for both). "The critical factor in determining the competency of an expert is whether that expert has knowledge that can assist the trier of fact in resolving the issues before it." *Id.* at 253; *see also* Utah R.Evid. 702. We conclude that the trial court committed no abuse of discretion in allowing the State's experts to testify.

## SUFFICIENCY OF EVIDENCE

■ Defendant claims that the evidence presented was insufficient to establish guilt beyond a reasonable doubt. To convict a person of violating section 76-5-206(1), the State must establish, beyond a reasonable doubt, both prohibited conduct and a culpable mental state. To establish a culpable mental state, the prosecution must present evidence that defendant was unaware of a *substantial and unjustifiable* risk of death, but should have been so aware.

We review defendant's claim under a standard that does not permit us to substitute our judgment for that of the jury in a criminal trial. *See State v. Tolman,* 775 P.2d 422, 424 (Utah Ct.App.1989). Rather, we review the evidence and all inferences which may reasonably be drawn from it in the light most favorable to the verdict of the jury. We reverse a jury conviction for insufficient evidence only when the evidence, so viewed, is sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime of which he was convicted.

*State v. Booker,* 709 P.2d 342, 345 (Utah 1985) (quoting *State v. Petree,* 659 P.2d 443, 444 (Utah 1983)); *see also State v. Hopkins,* 782 P.2d 475, 477. (Utah 1989).

Defendant testified at trial that the grandparents weighed the newborn baby and determined it to be about five pounds. Defendant also said he believed the baby to be two to three weeks premature. Defendant was aware that the baby was having "grunting respirations," which he said was a sign of early respiratory distress syndrome. Defendant positioned the baby in such a way that the labored breathing was relieved. He further testified that the severity of the respiratory distress did not indicate a need for hospitalization. He said that he informed Ivy that the baby was premature and had difficulty in breathing, but that the baby was then stable. He instructed Ivy to call him if there was any change and admitted that he was depending on Ivy to carefully watch the infant. Before leaving the Young residence, defendant noted that the respiratory difficulty had subsided. He stated, "The baby was respiring well, the baby was still awake and alert and muscle tone was still good." He also said,

> I was impressed that the baby had already shown some signs of respiratory distress syndrome, but under similar circumstances in the past, I have left babies at home, having instructed the mother on how to nurse, having instructed the mother to keep the baby warm and therefore I felt I could leave, confident that grandma would call me, confident that if there were any progression of symptoms that I would be called.

Defendant later testified that of 300 home births he had attended, approximately ten of those babies had been premature. Eight of those had had respiratory distress, but defendant said that he had hospitalized only three of those eight. In the case of this infant, defendant testified that "in my experience and the judgment that I applied at the time based on experience with babies who are even smaller than this delivered at home, they can in many cases get along very, very well...."

The State's expert medical witnesses testified that although the mother and baby "would do better" in a hospital, defendant's evaluation of the infant's well-being would indicate that the baby's vital signs were "acceptable." They conceded that the in-

fant may have survived had he been hospitalized up to ten hours after birth, but believed that leaving the baby at home was "bad judgment" on defendant's part.[3]

The State's neonatologist testified that hyaline membrane disease is a progressive disease. He also indicated that a baby in the condition of the deceased is typically "at high risk for medical and surgical problems." As far as mortality for an infant with the disease, however, he stated that the failure to provide therapy would only place the probability of death at five to fifteen percent. He later stated upon cross-examination that statistically only two percent of babies die from *untreated* hyaline membrane disease. He further said, "I guess the message is it's very unusual and rare to lose a baby at this gestation and this birth weight from hyaline membrane disease."

Asked whether it would be outside the medical standard of care to have the family of a home-delivered newborn to monitor any changes in the baby's condition, the neonatologist believed it was, but conceded that other competent physicians would disagree with him. Other experts for the State testified that the medical community in Utah does not teach or train physicians for home delivery and generally recommends against it.

We are convinced that even looking at the evidence in the light most favorable to the verdict, that evidence was "sufficiently inconclusive" to establish that there was a substantial and unjustifiable risk of death such that defendant should have been aware of it. Thus in examining the evidence presented, reasonable minds must have entertained "a reasonable doubt that the defendant committed the crime of which he was convicted." See *Booker*, 709 P.2d at 345.

Since we conclude that the evidence failed to establish criminal negligence, we need not reach the issue whether defendant's acts or omissions were the legal cause of death.

Defendant's conviction is reversed.

BULLOCK, J., concurs.

GREENWOOD, Judge: (concurring and dissenting).

I concur in Judge Bench's opinion concerning expert testimony, but dissent from the opinion's conclusion that there was not sufficient evidence to sustain the jury's conviction of negligent homicide. The majority opinion correctly states the necessary quantum of evidence for negligent homicide as being where the defendant should have been aware of a substantial and unjustified risk of death, but was not. *State v. Wessendorf*, 777 P.2d 523, 525 (Utah Ct.App.1989). Also, the risk must be such that an ordinary person would not disregard or fail to recognize it. *State v. Dyer*, 671 P.2d 142, 148 (Utah 1983). Therefore, in this case, the State was required to convince the jury that there was a substantial and unjustified risk that the infant would die if he did not receive medical care in a hospital-type setting; that defendant was unaware that the risk existed; and that an ordinary person in defendant's position would have recognized that risk. Our task as an appellate court, is to determine if the evidence presented, when viewed favorably to the jury verdict, "is sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime of which he was convicted." *State v. Booker*, 709 P.2d 342, 345 (Utah 1985) (quoting *State v. Petree*, 659 P.2d 443, 444 (1983)).

My assessment of the evidence supporting the jury verdict is as follows: defendant was a licensed physician who had maintained a family practice since 1968, including obstetrical care; defendant assumed responsibility for the infant's physical well-being by agreeing to deliver it at

3. Our research has revealed very few cases in which licensed physicians have been charged with negligent homicide. In many of those cases where such a charge has been brought, albeit under differing statutes, the courts have held that no criminal liability attaches when death results from an error of judgment. *See generally* Annotation, *Homicide Predicated on Improper Treatment of Disease or Injury*, 45 A.L.R.3d 114 (1972).

home; defendant did not insist on examining the mother when she reported vaginal bleeding to determine if premature birth was likely or if so, what precautions should be taken to minimize the likelihood of premature birth; defendant diagnosed the infant after birth as having Respiratory Distress Syndrome; defendant advised Ivy to position the infant in a way which relieved the symptoms but would not alleviate the condition itself; defendant minimized the seriousness of the infant's condition to Ivy and Joanne; three of the ten children he had delivered who had Respiratory Distress Syndrome were hospitalized; defendant knew the infant could die from the disease and that the disease was progressive; defendant could not himself admit the infant into a hospital because he lacked malpractice insurance, so would have to call another physician or have the infant admitted through an emergency room facility; Ivy testified that defendant only told her to watch the infant for changes in his temperature, color and respiration, without advising her as to the degree of change which might indicate a crisis, nor did he warn her or Joanne that death could result from the disease; and defendant left the infant in the care of laypersons.

There was other, conflicting evidence which would indicate that defendant should not have been aware that a substantial risk existed. However, the existence of conflicting evidence, by itself, does not justify reversal of a jury verdict. *State v. Tolman*, 775 P.2d 422, 424–25 (Utah Ct.App. 1989). The jury has been through the arduous task of listening to and assessing the evidence presented in this most difficult case, and I do not think that we should appropriately substitute our judgment for that of the jury. The jury's conclusion was based on what defendant knew or the jury believed he knew at the time, and its assessment that given that knowledge he should have known the risks. I do not find the evidence "sufficiently inconclusive," as do my colleagues, to justify conviction. I would conclude that the record, while heatedly controverted, contains sufficient evidence for the jury to conclude that defendant should have been aware that a sub-

stantial and unjustified risk of death existed, and to convict defendant of negligent homicide as a result.