**STATE of Utah, Plaintiff and Petitioner,**

v.

**David R. WARDEN, Defendant and Respondent.**

**No. 900087.**

Supreme Court of Utah.

June 4, 1991.

Brian J. Namba, Farmington, and Melvin C. Wilson, Clearfield, for plaintiff and petitioner.

Darwin C. Hansen, Salt Lake City, for defendant and respondent.

ON CERTIORARI TO THE UTAH
COURT OF APPEALS

HALL, Chief Justice:

The State challenges a decision of the

Utah Court of Appeals[1] which overturned a conviction on the ground that there was insufficient evidence for a jury to find Dr. David R. Warden guilty of negligent homicide, a class A misdemeanor.[2]

In reviewing a case appealed on the ground of insufficiency of evidence, we recite the facts in the light most favorable to the jury's verdict.[3] Warden is a licensed and board-certified physician who has been practicing family medicine in Kaysville, Utah, since 1968. He also provides obstetrical care and estimates that he has attended approximately 2,500 births, 300 of which have been home deliveries. However, at all times relevant to this case, Warden lacked malpractice insurance. He therefore did not have hospital privileges and only delivered babies in home settings.

In September 1986, Warden was visited by Joanne Young, an eighteen-year-old who was pregnant. In connection with her pregnancy, she had previously seen Dr. Bitner, who had given her a complete obstetric exam and estimated the date of delivery to be December 20, 1986. Dr. Bitner had scheduled Young for an ultrasound examination in order to firmly establish the delivery date. Prior to the examination, however, Young changed doctors because she wished to have a home delivery. Warden, based on his examination of Young and medical records received from Dr. Bitner, estimated the date of delivery to be December 17, 1986. However, he did not perform an ultrasound to confirm this date. Warden also decided that Young was a suitable candidate for home delivery due to her health and the fact that Young's mother, Ivy Young, was available to provide care after the birth.

On the morning of November 7, 1986, approximately six weeks before her delivery date, Young developed cramps and vaginal bleeding. Ivy Young phoned Warden and informed him of her daughter's condition. She also told him that John Shaw, the father of the baby, thought that conception may have occurred a month earlier than was previously reported. Warden told Ivy Young that her daughter was in labor and not to worry. He instructed her to call back at 1 p.m. Ivy Young called again at 1 p.m. and was told that it was not necessary to bring her daughter to the clinic. She called again at 4 p.m. and told Warden that her daughter was having contractions and "losing blood clots." She was then told to "stop fussing" and call back when the contractions were three to five minutes apart. At 10:15 p.m., Ivy Young phoned Dr. Warden to tell him that her daughter was in the last stage of labor. At no time during this interval did Warden examine Young to determine if premature birth was likely and, if so, what precautions should be taken to minimize the likelihood of a premature birth.

Warden arrived at the Youngs' house at approximately 10:30 p.m. Shortly thereafter, Young gave birth to a male infant. The birth was attended by Warden, Young's parents, and John Shaw. Sharron Johnson, Young's older sister, arrived soon after the birth. The infant was weighed on a bathroom scale. His weight was estimated to be approximately four pounds. Soon after the birth, the newborn began experiencing respiratory problems, as evidenced by a periodic grunting sound the infant made while breathing and his purplish-blue color. Warden recognized that the infant was premature and showing symptoms of respiratory distress syndrome—a disease that Warden knew was progressive, linked to premature births, and could result in death. Warden, however, did not inform the Youngs of the baby's condition and positioned the infant in a way that would mask the symptoms but would not affect the condition itself. Sharron Johnson, who was concerned about the periodic grunting sounds, asked Warden whether the baby needed to be hospitalized. Warden told her that hospitalization was not indicated and that the type of breathing exhibited was normal in premature babies. Ivy Young

---

1. *State v. Warden,* 784 P.2d 1204 (Utah Ct.App. 1989).

2. *See* Utah Code Ann. § 76–5–206.

3. *See State v. Verde,* 770 P.2d 116, 117 (Utah 1989), and cases cited therein.

was also concerned about the infant and repeatedly asked Warden whether the baby needed "to be checked or any other attention." Warden's only reply was, "[N]o grandma you watch the baby."

At 11:40, approximately forty minutes after the birth, Warden left the home. In instructing Ivy Young to watch the baby, Warden did not tell her or anyone else in the household specifically what to watch for, nor did he tell anyone that the baby was suffering from a condition that could result in death.

During the night, the infant's condition appeared to remain virtually unchanged. The only perceivable difference was that his hands and feet had turned a deeper shade of blue. Ivy Young responded by attempting to warm him. Throughout the night, the bluish coloring of his face and torso did not seem to change. At 8 a.m., however, the period of silent breathing between the episodes of grunting respiration increased, and Ivy Young became concerned that he may have stopped breathing. Although she was not positive that the baby was no longer breathing, she nonetheless attempted to revive him by gently rubbing his chest and breathing into his face. After a period of time, the infant let out a cry and began a grunting respiration. Ivy Young was relieved that he had apparently returned to the condition he had been in since birth. She was still very concerned that the infant "had taken a turn." She immediately attempted to call Warden at his home and later at his office, without success. She succeeded, however, in contacting her clergyman, who came to her home accompanied by a pediatrician, Dr. Kramer. The infant appeared to Dr. Kramer to be near death. The newborn was immediately transferred to a nearby hospital but was pronounced dead shortly after arrival. Ivy Young did not take the baby to a hospital herself because she expected Warden to arrive at any time and did not realize the seriousness of the baby's condition.

Warden's house was only five blocks and his office was only six to eight blocks from the Youngs' home. He was up at 6:00 the following morning; nevertheless, he made no attempt to contact his patients until noon that day, when, for the first time, he phoned the Youngs and was informed of the infant's death.

At trial, the State called several expert witnesses who testified that the infant died of respiratory distress syndrome due to prematurity, weighed approximately four pounds, and was the gestational age of approximately 33–34 weeks, 40 weeks being full term. The expert testimony also established that a doctor, simply by observing the size and measuring the dimensions of the infant, could tell that he was very premature.

It was also established that the Youngs were not in a position to determine if the baby's condition was deteriorating. Indeed, the evidence at trial established the following: The Youngs were told that an obvious symptom of the disease was normal and that despite his size and color, the infant did not need medical attention; changes in the symptoms as the disease progresses can be extremely subtle; smaller, weaker babies often do not exhibit many symptoms; it is possible for a baby's condition to remain relatively stable for a period of time and then drastically deteriorate; and family members, who are emotionally attached to the baby, are often unable to make objective judgments.

Evidence was presented concerning the standard of care used by doctors in Utah for the delivery and care of newborns. It was established that, given the information Warden had at the time, the standard of care would require him to examine Young prior to the time birth was imminent. If it was established that Young was going into labor prematurely and the labor could not be stopped, then the proper standard of care would require that she be placed in an intensive care unit for the delivery. With regard to the care of the newborn, evidence was presented that an infant of the gestational age of 33–34 weeks should be hospitalized, regardless of the infant's condition. The standard of care for a newborn of the gestational age and symptoms of the infant in this case would require placement in an

intensive care unit. Monitors would be placed on the infant to establish the oxygen and carbon dioxide concentration in the blood. Chest x-rays should also be taken, and the baby's blood should be analyzed for PH levels, blood gases, and blood sugar. If these measurements showed that the baby's condition was deteriorating, the infant should be transferred to one of the three hospitals in the state with the highest level of neonatal intensive care.

Evidence was also presented that the standard of care in obstetrics does not vary from hospital to home-birth settings and that Warden's actions were "absolutely not" within the standard of care. Indeed, Dr. Branch, an obstetrician/gynecologist who teaches at the University of Utah Medical School, testified that if a resident ever treated patients in the same manner as Warden did, he would tell the resident that "[h]e better not ever, ever do that again or [Dr. Branch] will see to it that he's on the street." Finally, it was established that Warden's treatment resulted in an increased risk of mortality of up to twenty times and that if the infant had received the proper care, he would have had a better than 99 percent chance of survival.

On February 22, 1988, a jury convicted Dr. Warden of negligent homicide. On November 22, 1989, the Utah Court of Appeals reversed the conviction on the ground that there was insufficient evidence to establish that Dr. Warden's conduct deviated significantly from the applicable standard of care.[4] The State petitioned this court for certiorari on the grounds that the court of appeals used an inappropriate standard of review and that there was sufficient evidence of Dr. Warden's guilt.

The proper standard of review for appeals concerning the sufficiency of evidence is well established. In making the determination as to whether there is sufficient evidence to uphold a conviction, an appellate court does not sit as a second fact finder. It is not the function of a reviewing court to determine guilt or innocence or judge the credibility of witnesses.[5] The mere existence of conflicting evidence, therefore, does not warrant reversal.[6] Rather, the function of a reviewing court is limited to insuring that there is sufficient competent evidence regarding each element of the charge to enable a jury to find, beyond a reasonable doubt, that the defendant committed the crime.[7] Therefore, when reviewing a claim of insufficiency of the evidence, the evidence and all reasonable inferences that may be drawn therefrom are viewed in the light most favorable to the jury verdict.[8] It is only when the evidence, viewed in this light, is so inconclusive or inherently improbable that a jury must have entertained a reasonable doubt as to the defendant's guilt that it is proper to overturn the conviction.[9] Although the court of appeals stated the proper standard,[10] a review of the record reveals that the standard was not applied. In fact, in recounting the facts of the case, the court of appeals set out several facts that are contradicted by evidence in support of the jury verdict. It is necessary, therefore, to properly apply the correct standard of review to determine whether Warden's conviction should have been overturned.

Warden was convicted of the crime of negligent homicide. Utah Code Ann. § 76–5–206(1) (Supp.1988) establishes that negligent homicide is committed when a person "acting with criminal negligence,

---

**4.** *State v. Warden,* 784 P.2d 1204, 1209 (Utah Ct.App.1989).

**5.** *State v. Hopkins,* 782 P.2d 475, 477 (Utah 1989); *State v. Watts,* 675 P.2d 566, 568 (Utah 1983); *see State v. Petree,* 659 P.2d 443, 444 (Utah 1983); *State v. Nebeker,* 657 P.2d 1359, 1364 (Utah 1983).

**6.** *State v. Hopkins,* 782 P.2d at 477; *State v. Lovato,* 702 P.2d 101, 107 (Utah 1985).

**7.** *See generally* Utah Code Ann. § 76–1–501(1) (each element of a crime must be proven beyond a reasonable doubt).

**8.** *See, e.g., State v. Verde,* 770 P.2d at 124; *State v. Bolsinger,* 699 P.2d 1214, 1218 (Utah 1985); *State v. Booker,* 709 P.2d 342, 345 (Utah 1985).

**9.** *See, e.g., State v. Verde,* 770 P.2d at 124; *State v. Booker,* 709 P.2d at 345; *State v. Watts,* 675 P.2d at 568.

**10.** *State v. Warden,* 784 P.2d at 1208.

causes the death of another." Utah Code Ann. § 76-2-103 (Supp.1988) states that a person acts

> [w]ith criminal negligence or is criminally negligent with respect to circumstances surrounding his conduct when he ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that the ordinary person would exercise in all the circumstances as viewed by the actor's standpoint.

At this point, it is important to note that criminal negligence differs substantially from ordinary civil negligence. Indeed, this court has stated that evidence of civil negligence is insufficient to convict a person of negligent homicide.[11] In situations where it is alleged that a medical doctor was negligent in the treatment of a patient, that doctor may be held civilly liable if the evidence establishes that it is more likely than not that the doctor's treatment fell below the appropriate standard of care.[12] In contrast, a doctor may be held criminally liable only when the evidence establishes beyond a reasonable doubt that the doctor's treatment created a substantial and unjustifiable risk that the patient would die, that the doctor should have but failed to perceive this risk, and that the risk is of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care. Given the high showing required for negligent homicide, doctors' negligence in the treatment of patients will rarely precipitate criminal liability. It is also true, however, that if doctors act with criminal negligence, they should not escape criminal liability merely because the negligence occurred in a professional setting.

In the instant case, therefore, Warden's conviction should be upheld if there is sufficient evidence for a jury to believe, beyond a reasonable doubt, that in the treatment of Joanne Young and her baby, Warden acted with criminal negligence which constituted the legal cause of death.

When the evidence is viewed in the proper light, it is clear that there is sufficient evidence that defendant acted with criminal negligence. There is ample evidence that his actions resulted in a substantial and unjustifiable risk that the newborn would die. The State's expert witnesses gave competent testimony that because the baby was not hospitalized, he was twenty times more likely to die. There was further testimony that if the baby had been treated in accordance with the appropriate standard of care, he would have had better than a 99 percent chance of survival. In addition, defendant's own testimony provides evidence that he did not perceive this risk. Given this evidence, a jury could believe beyond a reasonable doubt that there was a substantial and unjustified risk of death and that defendant did not perceive this risk.

There is also sufficient evidence for the jury to find that the risk created by Warden's treatment was of such a nature and degree that he should have perceived it and that his failure to perceive the risk constitutes a gross deviation from the appropriate standard of care. When reviewing the evidence presented at trial, it is important to note that the circumstances must be "viewed [from] the actor's standpoint."[13] Since the negligence occurred in the context of medical treatment, it is necessary to view the circumstances from the viewpoint of a member of the medical profession. Expert testimony established that Warden, by not examining Young prior to the time birth was imminent and not hospitalizing the infant immediately after the birth, deviated from the standard of care which physicians using ordinary care exercise in the delivery and care of newborns.

---

**11.** *State v. Standiford,* 769 P.2d 254, 267 (Utah 1988).

**12.** 61 Am.Jur.2d *Physicians, Surgeons, Etc.* § 329 (1981). *See generally Dalley v. Utah Valley Regional Medical Center,* 791 P.2d 193, 195 (Utah 1990) (elements of civil malpractice claim).

**13.** Utah Code Ann. § 76-2-103.

Specifically, it was established that Warden did not examine Young in the early stages of her labor and therefore did not diagnose the premature labor, take measures to stop the labor, or hospitalize her in anticipation of a premature birth. It was also established that Warden was aware that the infant was premature and should have been aware that the child was very premature. Warden's own testimony established that he knew the baby was showing signs of respiratory distress syndrome. Expert testimony established that given the infant's condition, he should have been placed in intensive care immediately after the birth and, if the condition deteriorated, transferred to a hospital with the most sophisticated level of neonatal intensive care. However, instead of placing the baby in the hospital, Warden left the infant with the Youngs, who had no medical training. He then told the Youngs that an obvious symptom of the disease was a normal condition, stated that the baby did not need medical attention, and positioned the infant in a manner which masked the symptoms of the disorder. Indeed, the jury could have reasonably inferred that without Warden's reassurances, the Youngs would have sought additional medical attention after the baby was born. The evidence, therefore, establishes a wide gulf between the standard of care the infant should have received and the care he, in fact, received. The infant was in need of the most sophisticated treatment available, but due to Warden's reassurances, he received a level of care below that which the Youngs, who have no medical training, would have otherwise provided.

Furthermore, Warden's negligence did not stop when he left the Youngs' house. Warden, after leaving the baby in such a dangerous situation, did not see fit to check on the baby's condition until noon the next day. It should also be noted that due to the fact that Warden lacked malpractice insurance, he would have had to call another doctor to admit the infant into the hospital. The jury could have reasonably inferred that this could cause Warden embarrassment and that this embarrassment could have influenced his decision not to hospitalize the baby. Finally, it was established that due to Warden's treatment, the infant was twenty times more likely to die than would have been the case if the infant had been treated with the proper standard of care.

In summary, there was evidence of repeated deviations from the standard of care, a wide divergence between the appropriate level of care and the care actually received, a significant chance of death that could have been alleviated by hospitalizing the infant, as well as other evidence of the degree of negligence and evidence that inappropriate factors could have influenced Warden's decisions. Given this evidence, the jury could well have believed, beyond a reasonable doubt, that Warden should have perceived the risk created by his treatment and that his failure to perceive the risk constituted a gross deviation from the appropriate standard of care.

Warden claims that not only was there insufficient evidence of criminal negligence, but also there was insufficient evidence that his negligence was a legal cause of death. However, again looking at the evidence in the light most favorable to the jury verdict, it is clear that there is sufficient evidence of a causal connection between Warden's actions and the infant's death. Warden assumed responsibility for the infant's well-being by agreeing to deliver the baby at home. He failed to take any measures to deal with the obvious possibility that Young was in labor prematurely. He diagnosed the baby as premature and showing the symptoms of respiratory distress syndrome, but left the newborn at home when an infant with such symptoms should have been placed in an intensive care unit. He did not tell the Youngs what to watch for, nor did he tell them that the infant's condition could result in death. In fact, he told the Youngs that the infant's breathing was normal and that the baby did not need any further medical observation. The Youngs testified that they did not realize the seriousness of the baby's condition nor sense that his condition was deteriorating throughout the night. Expert testimony revealed that the Youngs,

given what Warden had told them, were not in a position to judge whether the infant's condition was deteriorating. Warden lived five blocks from the Youngs' home, his office was only six to eight blocks from the Youngs' home, and he was up at 6:00 the following morning; nevertheless, he did not contact the Youngs until noon that day. When the Youngs observed that the infant "had taken a turn," they phoned Warden, without success, and then obtained the help of another physician. The Youngs did not take the infant to the hospital themselves because they assumed Warden would visit at any time, and due to what Warden had told them, they did not realize the seriousness of the baby's condition. The baby died of respiratory distress syndrome.

We conclude that the evidence was clearly sufficient to show that in the treatment of Joanne Young and her baby, Warden acted with criminal negligence which constituted the legal cause of death.

The court of appeals decision is reversed, and the jury verdict is upheld.

HOWE, Associate C.J., and DURHAM and ZIMMERMAN, JJ., concur.

STEWART, Justice (dissenting):

I dissent. In my view, Dr. Warden's actions did not satisfy the statutory requirements necessary to support a conviction of negligent homicide under Utah Code Ann. § 76–5–206 (1990). According to Utah Code Ann. § 76–2–103(4) (1990), a person is criminally negligent

with respect to circumstances surrounding his conduct or the result of his conduct when he ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise in all the circumstances as viewed from the actor's standpoint.

The Code provisions defining criminal negligence and negligent homicide are taken directly from the Model Penal Code. The commentary to the Model Penal Code states that a primary factor in criminal negligence is the actor's lack of awareness of creation of a risk. "A person acts negligently under this subsection when he inadvertently creates a substantial and unjustifiable risk of which he ought to be aware." Model Penal Code § 2.02 comment 4, at 240 (Official Draft and Revised Comments 1985). One commentator has stated: "The most obvious difference between intentional and [criminally] negligent conduct is that in the former case, the actor chooses to do harm, while in the latter, he is unaware that he is causing harm."[1] Fletcher, *The Theory of Criminal Negligence: A Comparative Analysis*, 119 U.Pa.L.Rev. 401, 408 (1971). *See also State v. Standiford*, 769 P.2d 254, 267 (Utah 1988); *State v. Hallett*, 619 P.2d 335, 338 (Utah 1980). The risk created by the inadvertent conduct must be a substantial and unjustifiable risk such that the failure to perceive the risk constitutes a gross deviation from the standard of care that an ordinary person would

---

**1.** Criminal negligence is most often compared with recklessness, the *mens rea* required for one type of manslaughter. The commentary to the Model Penal Code elaborates on the distinction between the two:

[The] level of culpability [required for criminal negligence] should be distinguished from recklessness, which suffices for conviction of manslaughter under Section 210.3. The essence of the difference between recklessness and negligence as those terms are defined in Section 2.02 of the Model Code is that the reckless actor must "consciously disregard" a substantial and unjustifiable homicidal risk created by his conduct, whereas the negligent actor need only disregard a risk of which he "should be aware."

Inadvertence to risk is thus the basis upon which condemnation for negligence proceeds, coupled with the judgment that the actor's failure to perceive the risk involves a "gross deviation from the standard of care that a reasonable person would observe in the actor's situation."

Model Penal Code § 210.4 comment 1, at 80–81 (Official Draft and Revised Comments 1980). Summarily stated, recklessness requires awareness of a substantial and unjustifiable risk and a conscious disregard of the risk, while criminal negligence requires unawareness of a substantial and unjustifiable risk of which the actor ought to have been aware.

exercise. The Model Penal Code commentary states: "Considering the nature and purpose of his conduct and the circumstances known to him, the question is whether the defendant's failure to perceive a risk involves a *gross deviation from the standard of care that a reasonable person would observe in the actor's situation.*" Model Penal Code § 2.02 comment 4, at 241 (Official Draft and Revised Comments 1985) (emphasis added). Ordinary negligence, which may serve as the basis for damages in a civil action, is "not sufficient to constitute criminal negligence." *Standiford,* 769 P.2d at 267.

Criminal negligence cases pose difficult issues as to vagueness and the fundamental fairness of basing a conviction on a subjective standard as to what kind of conduct is prohibited. *See* O'Hearn, *Criminal Negligence: An Analysis in Depth,* 7 Crim.L.Q. 27, 29 (1964–65). The Model Penal Code commentary states:

> [I]t is quite impossible to avoid tautological articulation of the final question. The tribunal must evaluate the actor's failure of perception and determine whether, under all the circumstances, it was serious enough to be condemned.

Model Penal Code § 2.02 comment 4, at 241. *See also* Annotation, *Homicide Predicated on Improper Treatment of Disease or Injury,* 45 A.L.R.3d 114, 145 (1972).

Because of the dual nature of the determination made by a jury in criminal negligence cases, a different standard of review is appropriate since it is necessary to determine both the sufficiency of the evidence and the propriety of the normative standard that is implicitly intertwined with the facts pertaining to the nature of the risk that gives rise to criminal liability. In the ordinary criminal case, the jury is informed of the legal elements of the crime, and if the jury finds that the evidence fits the elements, then an offense has been committed. In criminal negligence cases, the jury decides not only the facts, but also the legal standard for the kind of conduct that warrants criminal sanctions. Accordingly, we should carefully review the nature of the conduct the jury found to be criminal.

In my view, when the testimony of credible experts differs as to what appropriate conduct is, not because of some inherent issue of credibility but only because they assess the risk factors differently, as was the case here, we should exercise great care to assure that what, at least, is civil negligence is not held to be criminal negligence. In my view, the majority fails to make that distinction and holds that what is, at most, civil negligence is a crime.

The majority rules that Dr. Warden breached the standard of care in at least two instances. I believe that a careful examination of the evidence fails to support either that a breach occurred or that a criminal standard of care was in fact established. For example, the majority asserts that "given the information Warden had at the time [prior to the birth], the standard of care would require him to examine [Joanne] Young prior to the time birth was imminent." However, one of the prosecution's own experts, Dr. Branch, an obstetrician/gynecologist who teaches at the University of Utah, stated that given what Dr. Warden knew at the time, his decision to have Ivy Young simply observe her daughter prior to the birth and between phone calls to him did not fall outside the standard of care.

The majority also rules, "The standard of care for a newborn of the gestational age and symptoms of the infant in this case would require placement in an intensive care unit." It is true that one of the prosecution's own experts, Dr. Chan, testified that one of the reasons for hospitalizing the infant was because it "would be outside the standard of care to have lay family ... members ... watching and observing and monitoring a baby." He also conceded, however, that there were "other competent physicians in the practice that would ... disagree" with his assessment.

I submit that a conviction based on evidence that establishes such uncertain normative standards by the prosecution's own witnesses is simply unjustifiable. This is far removed from the situation in which someone runs a red light at 60 miles per hour, clearly violating standards of the

criminal law. *See State v. Hallett*, 619 P.2d 335 (Utah 1980).

Furthermore, none of the prosecution's expert witnesses practiced home deliveries. The defense produced its own expert, Dr. Gregory White, who had performed over 1,000 home deliveries. He testified that some differences existed between home deliveries and hospital deliveries, that generally Dr. Warden's actions did not violate the standard of care, and in particular, that hospitalization of the infant was not necessarily indicated.

In short, the evidence as to the standards of care Dr. Warden was charged with violating does not establish any clear and specific standard of care sufficient to meet the due process requirements of the law, irrespective of whether it is sufficient for a civil malpractice case. Furthermore, to apply a substantial evidence test to both the normative standard and the facts concerning breach, is to allow the jury to make the law, and to put all physicians who deal with life and death situations in an untenable position.

In addition, the evidence does not establish that the risk which Dr. Warden took was unjustifiable. The evidence demonstrates that Dr. Warden was well aware of the risk involved, but exercised a reasoned, professional judgment in deciding to forego hospitalization of the infant. His judgment was based on several factors. He drew on 20 years of experience with over 300 home deliveries. He testified that of the home-delivered infants, ten had been premature, and of those ten, eight had experienced respiratory distress syndrome. Of those eight, Dr. Warden had hospitalized three. He testified that the other five who had experienced respiratory distress syndrome improved without hospitalization and with only home care. Dr. Warden further testified that when he left the infant that night, he had made a conscious decision that the condition of the infant was similar to that of the five who had not required hospitalization. In fact, Dr. Warden testified that he had seen infants who had been more sick than the Young infant and had recovered without hospitalization.

Dr. Warden's own testimony on cross-examination demonstrated that he was aware of the risk and made a calculated judgment:

Q. (by the prosecutor) We have a risk here, a child who obviously is exhibiting the symptoms of respiratory distress syndrome; is that right?

A. Correct.

Q. You're aware of that risk?

A. Yes.

Q. You're aware that this child could, if it worsens, die from that, are you not?

A. That's correct.

Q. You're aware of all of those factors?

A. Yes.

Q. You have a grandmother here that you have confidence in relative to her care of that child, right?

A. Yes.

Q. And you also in your own mind have a consideration that this may be expensive to take this child to a hospital, right?

A. Yes.

Q. Now, at that point in time, you elect in your own mind, exercise that judgment and you elect not to recommend that the child be taken to the hospital at that time; is that right?

A. Yes.

Q. Now, you're also aware, are you not, Doctor, as to the progressive nature of this disease?

A. Yes, I am.

Q. And you're also aware, are you not, that exercising caution in these circumstances is of the utmost importance to the life of that child?

A. That's correct.

Q. Now, did you feel in your own mind that by placing that child in the care of a lay person that that indeed was exercising caution in this respect?

A. Mr. Wilson, I exercised judgment.

. . . . .

Dr. Warden's professional judgment that the infant would survive if left at home under the observation of the grandmother, to whom he gave instructions, was concurred in by other competent physicians.

1156

Other testimony from the State's own witnesses demonstrated that the risk which Dr. Warden took was not an unjustifiable risk. For example, the State's expert medical witnesses testified that although the mother and baby "would do better" in a hospital, Dr. Warden's evaluation of the infant's vital signs indicated that they were "acceptable." Dr. Chan testified that statistically only 2 percent of babies die from untreated respiratory distress syndrome. He also stated: "I guess the message is it's very unusual and rare to lose a baby at this gestation and this birth weight from hyaline membrane disease." Furthermore, Dr. Warden had been informed that the family wished to minimize the expense of the birth and did not want to go to a hospital because of the expense.

Finally, the evidence does not support the conclusion that Dr. Warden's actions caused the child's death. He left the child in the care of the grandmother, who was instructed to call him if the child's condition worsened. The State's experts testified that a layperson would be unable to recognize subtle changes in the condition of the child as the disease progressed but, in the early morning hours, a manifestly obvious change occurred. At 8 a.m., the child stopped breathing. The grandmother resuscitated the child and then called the doctor's office but did not disclose her name or that the situation was an emergency. Although Dr. Warden was not at his office at the time, he was available and could have responded if the nature of the emergency had been communicated to his office. The grandmother then called a friend and discussed the birth of the child, but she did not mention that it had stopped breathing. Later, she called her clergyman, but again did not advise him of the emergency. At 10:30 a.m., the clergyman and another doctor arrived at the home, and the child was hospitalized. Any kind of reasonably prompt action by the grandmother may well have saved the child's life. Because of her intervening unreasonable failure to inform Dr. Warden's office of the emergency, Dr. Warden was not the legal cause of the child's death.

In my view, the criminal law should not be used to punish a physician for a death when he or she makes a decision that turns out to have a fatal consequence, simply because some other physician, acting in more favorable circumstances, would have done differently.